**MR. MAGIC CAR WASH, INC.,**
**Plaintiff-Appellant,**

v.

**DEPARTMENT OF ENERGY,**
**Defendant-Appellee.**

**No. 3–19.**

Temporary Emergency Court of Appeals.

Argued June 20, 1978.
Decided Oct. 31, 1978.

Jon Hogue, Kaufman & Harris, Pittsburgh, Pa., was on the brief for appellant.

Richard A. Sauber, Washington, D. C., with whom Dennis G. Linder and Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., were on the brief for appellee.

Before HOFFMAN, SORG,* and GRANT, Judges.

GRANT, Judge.

This is an appeal from a District Court decision upholding a final Appeal Decision and Order issued April 22, 1975, by the Federal Energy Administration (FEA).[1] The District Court found that the agency's Order was within the authority of the agency and was supported by substantial evidence. We affirm.

In June, 1970, Plaintiff Mr. Magic Car Wash, Inc., (Mr. Magic), an independent marketer of motor gasoline which owns and operates a single retail service station in Pittsburgh, Pennsylvania, and Mobil Oil

---

* At the post-argument conference, Judge Sorg agreed with the conclusions expressed herein, but he has been ill since the preparation of this Opinion and has been unable to note his concurrence.

1. Upon enactment of the Federal Energy Administration Act of 1974, P.L. No. 93–275, 88 Stat. 96 (May 7, 1974), implemented by Executive Order 11790, the Federal Energy Office was abolished, and all authority delegated to the President by the Emergency Petroleum Al-

location Act was vested in the newly established Federal Energy Administration. Upon enactment of the Department of Energy Organization Act, P.L. 95–91, August 4, 1977, Executive Order No. 12009, 42 F.R. 46267 (September 15, 1977), the Department of Energy assumed the responsibility for enforcing the pricing and allocation authority. Since FEA was the responsible agency at the time relevant to this case, appellee will be referred to as "FEA" throughout this Opinion.

Corporation (Mobil), a major, integrated petroleum company, entered into a supply contract whereby Mobil agreed to sell and Mr. Magic agreed to buy five million gallons of gasoline over a five-year period.

The price offered Mr. Magic was 2.5 cents per gallon lower than the regular dealer tank wagon price. Other considerations, including a cash loan and a $10,000 line of credit from Mobil, were included in the agreement.

The supply contract between the parties was established by two letters dated June 22nd and June 23rd, 1970. Mobil's June 22nd letter to Mr. Magic read in part:

> In order to meet offers that have previously been made to you by one or more of our competitors, we have agreed to give you a competitive discount . . .

The letter closes with the statement:

> Please sign and return the copy of this letter indicating your acceptance of these terms.

The letter was "accepted and agreed to" with the signature of James Schaming, president of Mr. Magic.

The second letter, dated June 23rd, was even more explicit:

> On June 22, 1970, we (Mobil) made a Dealer Contract with you (Mr. Magic).

In order to meet competitive conditions as represented by you and confirmed by your acceptance of this agreement, we have, as you know, furnished you with a (competitive discount and prepayment)

. . .

You have represented to us that a responsible competitor of ours has offered to you an agreement or agreements involving substantially the same benefits and on substantially the same terms as those contained in our agreements with you

. . .

Again, the letter was "accepted and agreed to" by James Schaming.

On June 26, 1973, Mobil notified Mr. Magic of its intention to exercise its right to withdraw the competitive allowance, whereupon, on August 30, 1973, Mr. Magic timely exercised its right of termination of the agreement. Mobil released Mr. Magic from any further obligation under the contract and Mr. Magic entered into a supply arrangement with another refiner.

The Emergency Petroleum Allocation Act of 1973,[2] (Allocation Act or EPAA), was enacted on November 27, 1973. When, in March, 1974, FEA's Mandatory Petroleum Allocation Regulations,[3] adopted pursuant

---

**2.** (a) The Emergency Petroleum Allocation Act of 1973 (P.L. 93–159, 15 U.S.C. § 751 *et seq.,*) became law on November 27, 1973. Section 4(a) of that Act imposed on the FEA the mandatory duty to regulate the price of oil. It provides as follows:

> Not later than fifteen days after the date of enactment of this Act, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. 15 U.S.C. § 753(a).

(b) Subsequently, FEA issued Part 212— Mandatory Petroleum Price Regulations (10 C.F.R. § 212.1 *et seq.*) to regulate prices throughout the industry. Former § 212.-82(b)(1), which was in effect during the period relevant to this litigation, defined the "base price" as:

> The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in trans-

actions with the class of purchaser concerned on May 15, 1973, and measured pursuant to the provisions of § 212.83. In computing the base price, a firm may not exclude any temporary special sale, deal or allowances in effect on May 15, 1973.

(c) Two definitions are involved within this general rule:

> "Class of purchaser" means purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers. 10 C.F.R. § 212.31.

(d) Section 212.31 further defines "customary price differentials" as follows:

> [A] price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery.

**3.** Both firms are subject to the provisions of the FEA Mandatory Petroleum Allocation and Price Regulations.

thereto,[4] required suppliers and dealers to return to the buyer-seller relationship as it existed on May 15, 1973, Mr. Magic and Mobil resumed dealing with each other. Following that compulsory re-establishment of Mobil's supplier relationship with Mr. Magic, a dispute arose as to the proper ceiling price of gasoline sold to the plaintiff.[5] Mobil alleged that the competitive situation that prompted the initial allowance was no longer present, and Mr. Magic should, therefore, be treated on a par with others in the relevant class of purchaser and, consequently, refused to reinstate either the competitive allowance or the credit arrangements which had been in effect during the base period.

Upon resuming the buyer-seller relationship mandated by the FEA, Mobil contended that it was required to charge Mr. Magic the same dealer tank wagon price it had charged all lessee-dealer retailers on May 15, 1973. Mr. Magic then filed a complaint with the FEA alleging that Mobil was in violation of 10 C.F.R. § 210.62 by refusing to reinstate the competitive allowance and the credit arrangement which had been the

> normal business practices of the supplier for that class of purchaser . . . during the base period.

While this controversy was pending before the FEA, the agency invited both Mobil and Mr. Magic to comment on its Ruling 1975–2 as it related to the pending appeal. Mobil replied by maintaining that the Ruling sustained its position because the discount granted Mr. Magic was granted solely on the basis of a competitive offer. Mobil further contended that the factors cited by Mr. Magic as cost justification had not resulted in any cost savings to Mobil, the supplier, and thus could not make the discount a customary price differential.

Mr. Magic's reply took the position that knowledge of cost justification is peculiarly within the knowledge of the seller and that, consequently, the purchaser should have the benefit of a cost justification which had the effect of shifting the burden to the seller. Mr. Magic submitted no evidence to support its conclusory allegations of cost justification.

Following that exchange, the FEA issued its final Appeal Decision and Order. The FEA ruled that Mr. Magic need only be included as a member of Mobil's class of purchaser, which includes all similarly situated retailers, rather than in a separate class based on the competitive allowance. We quote therefrom:

> The file in this matter demonstrates that Mobil offered the competitive allowance to Mr. Magic solely to meet the offer of a competitor. Mr. Magic has submitted no evidence to the contrary. That offer did not fall within any of the factors listed in Section 212.31 [6] to be taken into account in determining a "customary price differential". (R–199).

After determining that Mr. Magic did not constitute a unitary class of purchaser, the agency further held that:

> . . . Mobil must treat Mr. Magic as a member of its class of purchaser which includes other similarly situated retail dealers under FEA Regulations and Mr. Magic is not entitled to the competitive allowance . . .

Mr. Magic's petition for Rehearing or Modification and for a Stay of the FEA Decision were each denied, whereupon Mr. Magic commenced this action in the District Court, alleging that the FEA's decision was in excess of its statutory authority and was not based on substantial evidence.[7] The

---

4. 39 F.R. 1924 *et seq.*, January 15, 1974.

5. See Footnote 2(b), *supra.*

6. See Footnote 2(d), *supra.*

7. The applicable standard of review for FEA Decisions and Orders is set forth in Section 211 of the Economic Stabilization Act of 1970, as amended,* which is incorporated into the Allo-

cation Act by Section 5. In pertinent part, Section 211(d)(1) provides:

\* Section 5(a)(1) of the Allocation Act (87 Stat. 633) provides in pertinent part:

Except as provided in Paragraph (2)(A), Sections 205 through 211 of the Economic Stabilization Act of 1970 (as in effect on the date of enactment of the Act) shall apply to the regulation promulgated under Section 4(a), to any order under this Act, and to any action

District Court found that there was no evidence in the record to suggest that the discount was based on any of the factors suggested by Mr. Magic in its complaint, and upheld the FEA's determination that Mr. Magic's discount was solely a competitive discount. Summary judgment was entered for the FEA, whereupon Mr. Magic instituted this appeal.

The Emergency Petroleum Allocation Act of 1973, P.L. 93–159, 87 Stat. 627, 15 U.S.C. § 751, *et seq.,* was enacted by Congress and approved by the President on November 27, 1973. In Section 2 of that Act, Congress, after determining that "shortages of crude oil, residual fuel oil, and refined petroleum products . . . now exist or are imminent"; that "such shortages have created or will create severe economic dislocations and hardships, etc."; and that "such hardships and dislocations . . . constitute a national energy crisis which is a threat to the public health, safety and welfare, and can be averted or minimized most efficiently and effectively through prompt action by the Executive branch of government," pronounced the following declaration of purpose in enacting the EPAA:

> (b) The purpose of this chapter is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this chapter shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy.

Pub.L. 93–159, § 2, Nov. 27, 1973, 87 Stat. 628.

This broad objective was reinforced by Section 4(a) of the Act [8] which required the President, within 15 days after enactment, to issue a regulation to provide for the mandatory allocation of crude oil, residual fuel oil, and refined petroleum products, and at prices specified in such regulation.

Section 4(b)(1) of the EPAA provides that "regulation . . . to the maximum extent practicable, shall provide for . . :"

> (D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, non-branded independent marketers, and branded independent marketers;

> \*   \*   \*   \*   \*   \*

> (I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

In compliance with the Congressional mandate of the Allocation Act, the President delegated [9] that authority to the FEO.[10] Acting in accordance with that delegated authority, the agency adopted the allocation rules and price regulations here under challenge.

As we stated in *Pasco v. FEA,* 525 F.2d 1391:

> It was the duty of the FEA to enact regulations consistent with a proper interpretation of the Allocation Act's objectives and, having done so, to determine the questions of the application or non-application of such regulations to companies which are within the purview of the Act. In reviewing the discharge of an agency's function in interpreting the Act,

---

taken by the President (or his delegate) under this Act, as if such regulation had been promulgated, such order had been issued or such action had been taken under the Economic Stabilization Act of 1970 . . .
[N]o order of such agency shall be enjoined or set aside, in whole or in part unless a final judgment determines that such order is in excess of the agency's authority, or is based

upon findings which are not supported by substantial evidence.

**8.** See Footnote 2(a), *supra.*

**9.** Executive Order 11748 (38 F.R. 33575, December 6, 1973).

**10.** See Footnote 1, *supra.*

promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that *where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."* (Emphasis Added.) (Citations omitted.)

■ We have no difficulty in holding, as we do, that the actions of the agency, which are involved in this proceeding and which culminated in the April 22, 1975, final Appeal Decision and Order, were all well within the authority of the agency.

Mr. Magic further contends that, as a high-volume purchaser, operating an independently-owned car wash, it was a "class of purchaser" entitled to receive the price discount which it had been receiving from its supplier (Mobil) on May 15, 1973. Mr. Magic maintains that FEA's Ruling 1975–2 supports its position and cites the following language from the Ruling:

It is important to point out, however, that certain discounts may have been "competitive discounts" in form, having ostensibly been granted to meet a lower offer and with an affidavit having been executed by the buyer to the effect, but may nevertheless also be cost justified under the Robinson-Patman Act. For example, a retail gasoline dealer that owns its retail facility may have been able to obtain a discount from its supplier that was made in good faith to meet a lower bona fide offer. But the willingness of sellers on May 15, 1973, to afford such discounts also reflected cost savings to such sellers, by virtue of the fact that other sales by such sellers were to customers that operated retail facilities owned by and leased from the sellers, and the rental for the facilities was reflected, in part, in the purchase price of gasoline. Similarly, "competitive" discounts on May 15, 1973, may have reflected cost savings attributable to volumes purchased, or to the fact that the sales were to non-branded rather than branded buyers, since in sales to non-branded customers sellers ordinarily do not incur certain expenses or do not provide certain services (such as a trademark license) that are incurred or provided in connection with sales to branded customers.

Thus, as a general rule the FEA will not require classes of purchaser to be established to maintain price differentials which on May 15, 1973, were in effect only to meet an equally low offer of a competitor. But the FEA will look behind broad assertions that a particular differential was a "competitive" discount and will determine whether in fact the differential was extended to meet a competitive offer and, even if it was, whether it was equally justifiable on a cost basis. Where there is an equally strong cost justification for a "competitive" discount, FEA will require it to be continued. 40 C.F.R. 10655.

■ Here, however, the record is devoid of any evidence that the discounts granted Mr. Magic were cost-justified to the supplier, Mobil, and, notwithstanding Mr. Magic's contention on appeal, there is, in Ruling 1975–2, no presumption favorable to Mr. Magic such as had existed in a prior ruling.[11] The only evidence in the record, aside from the conclusory allegations of Mr. Magic, supports the findings of the FEA and the District Court that "the file in this matter demonstrates that Mobil offered the competitive allowance to Mr. Magic *solely* to meet the offer of a competitor." (Emphasis added.) This very explicit statement was on two successive days "accepted and agreed to" by the president of Mr. Magic. There is nothing in the administrative record that would suggest an alternative explanation.

On the basis of the administrative record, we hold that the agency's Appeal Decision and Order was rational and supported by substantial evidence, and the District

---

11. That earlier Ruling (1974–18) was supplanted by Ruling 1975–2 which stated, "To the extent that there is any inconsistency between this ruling and those earlier rulings [1974–17 and 1974–18], this ruling will be controlling."

Court's finding of substantial evidence was not clearly erroneous. It was correct.

Mr. Magic further requested this Court to order a rehearing of this case at the administrative level. That request was denied by the District Court and properly so. Both parties had ample opportunity to present any available evidence during the administrative process. The agency specifically invited comment from them in the light of Ruling 1975–2. Mr. Magic's April 1, 1975, response thereto was, as hereinabove stated, that knowledge of cost justification is peculiarly within the knowledge of the seller and that, consequently, Mr. Magic should have the benefit of a cost justification which had the effect of shifting the burden to Mobil. Furthermore, as pointed out above, Ruling 1975–2 established no such presumption upon which Mr. Magic could stand, and Mr. Magic offered no evidence in support of its contentions.

■ We quote from FEA's Decision and Order of May 22, 1975:

Section 205.135(b)(1) of the FEA Procedural Regulations states that a request for modification or rescission of an order or interpretation *shall be processed only if "the application demonstrates that it is based on significantly changed circumstances."* The submission filed by Mr. Magic does not demonstrate or even allege that it is based upon significantly changed circumstances. The basis for that submission is the firm's assertion that the FEA's April 22 Decision is erroneous and its further claim that it is able to produce evidence to show that the competitive allowance which it received from Mobil was cost-justified. However, Mr. Magic was afforded a full opportunity to submit comments regarding the application of Ruling 1975–2 to its situation

with Mobil prior to the issuance of the April 22 Decision and Order and the comments which the firm filed were considered by the FEA in its determination of Mobil's Appeal. (Emphasis added.)

Mr. Magic's petition to reopen the administrative hearing failed to "demonstrate or even allege that it is based upon significantly changed circumstances". The Supreme Court has adhered to its practice of "declining to require reopening of the record, except in the most extraordinary circumstances."[12] No such situation is presented here.

The District Court was not clearly erroneous in granting the agency's motion for summary judgment. The judgment of the District Court is AFFIRMED.

---

**12.** *Bowman Transportation v. Arkansas-Best Freight,* 419 U.S. 281, 296, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

