MERRY TWINS, INC., S. K. Oil Corp., Capitol Auto Supplies, Inc., and Capitol Enterprises Systems, Inc., Plaintiffs-Appellants,

v.

EXXON CORPORATION, Defendant-Appellee.

No. 2–26.

Temporary Emergency Court of Appeals.

Argued Oct. 17, 1979.

Decided Dec. 19, 1979.

Carl S. Levine, New York City, with whom Seth D. Friedland, New York City, was on brief, for plaintiffs-appellants.

Paul Merolla, Sherman & Sterling, New York City, with whom Joseph T. McLaughlin and Ellen Miller Wachtel, New York City, D. Joseph Potvin, Houston, Tex., were on brief, for defendant-appellee.

Before GRANT, METZNER and LACEY, Judges.

GRANT, Judge.

Plaintiffs-Appellants, Merry Twins, Inc., et al. ("Merry Twins", treated herein as a single entity), alleged that Exxon Corporation ("Exxon") violated the Emergency Petroleum Allocation Act of 1973 ("EPAA") 15 U.S.C. §§ 751 et seq., and the regulations promulgated thereunder, 10 C.F.R. §§ 210–214, by its failure to continue to grant appellants certain discounts or allowances on the price of motor fuel during the period from March 1, 1974, through January 19, 1976. Following a trial to the court, the district court found and concluded that the price charged appellants by Exxon during this period was lawful and that Exxon was not required to maintain the discounts or

allowances claimed by appellants on the sale of motor fuel supplied them by Exxon. Finding that plaintiffs had failed to sustain their burden of proof that the price charged was excessive or illegal, the court ordered the entry of judgment against the plaintiffs, from which this appeal was taken. We affirm.

Merry Twins, a high volume retail gasoline service station located on the Long Island Expressway in Queens County, New York, had for many years been "Exxon" branded. Prior to December 5, 1972, all of its motor fuel was supplied by Exxon, a manufacturer and supplier of petroleum products. In mid-1972, the ownership of Merry Twins changed hands, whereupon, effective December 5, 1972, the new owners unilaterally and voluntarily terminated the station's relationship with Exxon. Prior thereto, they had negotiated an agreement with Alcor Petroleum Corporation ("Alcor"), an independent Texaco distributor, under which they were thereafter supplied with gasoline from December 5, 1972, through February 1974. Under that agreement with Alcor, Merry Twins was allowed a rebate on Texaco gasoline purchased—said rebate being in the amount of 3.85 cents per gallon of regular gasoline and 4.1 cents per gallon for high-test gasoline from Texaco's posted dealer tankwagon price for the geographic area. Earlier plaintiffs had attempted, but without success, to negotiate with Exxon for an increased rebate over and above the two cents per gallon which they had been receiving from Exxon's dealer tankwagon price, and which additional rebate, they maintained, was necessary to make their purchase of the Merry Twins Station economically feasible.

The district court found that during the period (prior to mid-1973) the retail petrole-um products industry in the New York City area was characterized by competition among the major refiners for the business of independent retailers and that rebates and other competitive allowances to customers such as Merry Twins were not unusual.

Then came the Arab oil embargo of 1973. The resulting shortage of gasoline supplies prompted Government intervention into supply arrangements within the gasoline distribution network. A program was needed to protect the independent operators to assure them a continued source of supply during the shortage and to prevent the major refiners from favoring their directly owned outlets.

In response to these needs, Congress enacted and the President signed into law the EPAA.[1] That Act created the Federal Energy Office[2] ("FEO") which office on January 14, 1974, issued Mandatory Petroleum Allocation and Price Regulations.[3] These regulations required Exxon and other suppliers of petroleum products, when requested, to supply their products to those wholesale purchasers who had been supplied by them in the corresponding month (January) of 1972.[4] Pursuant thereto, Alcor and/or Texaco announced that it was terminating its delivery of motor fuel to Merry Twins and did so terminate its deliveries in February 1974.

Thereupon, plaintiffs-appellants demanded that Exxon resume its supply of motor gasoline to Merry Twins. Appellants did not seek another supplier and other suppliers did not seek to supply Merry Twins at this time. This was the period of very short supply of motor gasoline as evidenced by car lines at every station, and it was the purpose of FEO's regulations to restore and

1. 15 U.S.C. §§ 751 et seq.

2. Upon enactment of the Federal Energy Administration Act of 1974, P.L. No. 93–275, 88 Stat. 96 (May 7, 1974), implemented by Executive Order 11790, the Federal Energy Office was abolished, and all authority delegated to the President by the Emergency Petroleum Allocation Act was vested in the newly established Federal Energy Administration. Upon enactment of the Department of Energy Organ-ization Act, P.L. 95–91, August 4, 1977, Executive Order No. 12009, 42 F.R. 46267 (September 15, 1977), the Department of Energy assumed the responsibility for enforcing the pricing and allocation authority.

3. 10 C.F.R. §§ 211.1 et seq. and §§ 212.1 et seq.

4. 10 C.F.R. §§ 211.9(a), 211.102.

maintain the January 1972 supply relationship for the duration of the Mandatory Petroleum Allocation Program.[5]

On March 1, 1974, pursuant to these requirements and appellants' demand on Exxon, Exxon, as Merry Twins' "base period supplier", commenced supplying motor fuel again to Merry Twins. When Exxon resumed supplying Merry Twins, Exxon treated it as a new customer for purposes of base price calculation since no supplier/purchaser relationship had existed between them on May 15, 1973, the base price date set by the regulations.[6] Exxon thus treated Merry Twins, pursuant to the federal regulations, as part of the pre-existing "class of purchaser" of all retail dealers supplied with motor gasoline through Exxon's Brooklyn terminal in New York.

Exxon continued to deliver motor gasoline to Merry Twins from its Brooklyn terminal from March 1, 1974, through January 19, 1976, the period of time here in controversy, and charged Merry Twins the posted dealer tankwagon price in effect at the Brooklyn terminal on the day of delivery. This was the same price which Exxon charged all retail dealers supplied with motor gasoline through its Brooklyn terminal during that period.

Plaintiffs-appellants contend that, on the re-establishment of their 1972 supplier/purchaser relationship, Exxon violated the EPAA and the regulations issued thereunder (1) by its refusal to continue, as to Exxon products, the rebate of 3.85 cents and 4.1 cents per gallon which they enjoyed from Alcor on May 15, 1973 (FEO's freeze date for price regulation), or (2) by Exxon's refusal to resume payment of the old rebate of two cents per gallon which Exxon had granted Merry Twins prior to the latter's termination of that supply relationship on December 1, 1972.[7]

The rebates or discounts which Exxon had in effect on May 15, 1973, were month-end allowances ("MEA's").[8] The district court found that these MEA's granted by Exxon "were given in response to competitive supply offers from other oil companies and were not customary price differentials within the meaning of 10 C.F.R. § 212.31".

We quote further from the finding of the district court: "On August 14, and 15, 1973, several months after competitive offers ceased to be a factor in the New York City district due to shortage of fuel, Exxon terminated all MEA's. Exxon granted no MEA's within the district from August 15, 1973, to January, 1976. Early in 1976,

5. 10 C.F.R. § 211.9(2).

6. 10 C.F.R. §§ 212.82–212.83. It will be noted here that the freeze on prices and the obligation to supply former customers were based on different dates more than 15 months apart. Whereas the EPAA, and the regulations promulgated thereunder, fixed the month of January 1972 as the base period for determining the right of an independent operator to receive petroleum products from his supplier, nevertheless that same agency fixed the later date of May 15, 1973, as the base period for price regulation.

7. At oral argument on appeal, appellants did not pursue their allegation that Exxon should be required to pay the higher rebate they had won from Texaco. On May 15, 1973, the base date for price regulation, no supplier/purchaser relationships existed between Exxon and Merry Twins. FEA Regulation 1977–10 makes clear that any rebate being afforded Merry Twins by Texaco on May 15, 1973, was not the responsibility of the base supplier, Exxon. That regulation states:

. . . seller is not required to reform its classes of purchaser to take into account discretionary pricing practices which it did not follow *in its own pricing behavior.* 42 Fed.Reg. 31146. (Emphasis supplied.)

See also *Diagnostic Servicenter, Inc. v. Mobil Oil Corporation,* 76 Civ. 2879–CLB (S.D.N.Y. Feb. 23, 1978). Thus, this opinion will address only the allegation shown at (2) above.

8. The district court described MEA's as follows:

A "Month End Allowance" is a discount or rebate on the price of motor fuel, stated in cents per gallon, granted at the beginning or renewal of a dealer's sales contract, and payable at the end of each month. The dealer pays full posted tankwagon price to the driver at each delivery, and receives a monthly rebate check from Exxon. The posted tankwagon price varies slightly from time to time, but is fixed as of each day applicable to all full tankwagon deliveries from the specified supply terminal.

MEA's were reinstated for dealers who presented evidence of competitive offers." (Finding at p. 10.)

The relevant Mandatory Petroleum Allocation Regulations at issue here are these:

The General Rule is 10 C.F.R. § 212.83, which provides:

"(a) General Rule. (1) Rule. A refiner may not charge to any class of purchaser a price for a covered product in excess of the maximum allowable price . . . ."

Maximum allowable price is defined in 10 C.F.R. § 212.82(6) as follows:

" 'Maximum allowable price' means the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, computed in accordance with the provisions of § 212.-83(a), plus increased product costs and increased non-product costs incurred between the month of measurement and the month of May 1973."

"Class of purchaser" is defined to mean: ". . . purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers." [10 C.F.R. § 212.31]

"Customary price differential" is in turn defined to include:

". . . a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery." [10 C.F.R. § 212.31]

The dispute between the parties to this lawsuit centers upon the meaning of those several provisions and how they relate to the price structure of Exxon on May 15, 1973.

On March 7, 1975, the FEA, "to clarify further the application of the class of purchaser concept", issued Ruling 1975–2.[9] Therein the agency listed the factors material to a "class of purchaser" determination as follows:

. . . For purposes of this ruling, the *important factors* . . . *are differences in*

(1) location,

(2) type of purchaser,

(3) volume, and

(4) term or condition of sale or delivery.

These factors, in the order listed above, provide a logical sequence for making class of purchaser determination.

Although price differentials may reflect differences in location both of the seller's outlet or distribution point and of the buyer's place of business, *location should be considered first as it relates to the seller.* To the extent that a seller has multiple locations from which it distributes products, it should make its class of purchaser determinations on a location-by-location basis. . . .

In evaluating its sales from a particular location, a seller should next look to *the types of customers it had, on May 15, 1973,* for purposes of making price determinations. There are certain readily apparent distinctions to be made in this regard, such as those relating to recognized levels of distribution (e. g., wholesale, *retail*, end-user, etc.), those relating to methods of sale (e. g., *branded*, nonbranded), and those relating to types of use (e. g., *re-sale,* industrial, commercial, residential, etc.). (Emphasis supplied.)

The district court found that "the MEA's granted by Exxon to most, if not all,[10] of its

---

**9.** CCH Energy Management, Federal Energy Guidelines, Section 16,042 at 16,073 (March 7, 1975).

**10.** Appellants contended in the district court that some of the "competitive affidavits" received into evidence as documentary proof of competitive offers to Exxon's dealers, and upon which MEA's were based, were "suspect at least" either because they were not notarized or were often scribbled on sales receipt pads, etc. No evidence in this record supports this conclusory argument and, further, no conclusion can be drawn that Exxon knew or should have known of any such falsity. None of them suggests cost justification as a basis for the MEA's.

retail customers in the New York City district, as of May 15, 1973, were given in response to competitive supply offers from other oil companies, and were not customary price differentials within the meaning of 10 C.F.R. § 212.31." There were no written contracts involved. They were granted pursuant to oral understandings with dealers, and were revocable at any time that competitive offers ceased to be a factor in the market place.[11]

Appellants contend that the MEA's were not competitive but were customary price differentials with respect to a class of customer and, in support thereof, argue that, prior to the gasoline shortage, none of these MEA's had been revoked during the period of a dealer's supply contract. This fact, however, is but an indication of continued competition among suppliers for the business of these independent dealers. There is nothing in the record to suggest that the competitive situation ever lessened or came to an end prior to the gas shortage of 1973. On August 14 and 15, 1973, after competitive offers ceased to be a factor in the New York City district due to gas shortages, Exxon terminated all MEA's. It was not until 1976 when gasoline became more plentiful and evidence of competitive offers began to reappear that MEA's were reinstated. From a consideration of all of the evidence, the district court found that "Exxon had no customary price differentials for a class of purchaser in effect on May 15, 1973, to which Merry Twins was entitled." That finding was not plainly erroneous, and we are in accord with the finding of the district court.

In *Mr. Magic Car Wash, Inc. v. Department of Energy*,[12] Mobil Oil Company had, prior to the imposition of petroleum price controls, entered into a supply contract with Mr. Magic under which Mr. Magic received a 2½ cents per gallon rebate, a cash loan, and a line of credit. Two exchanges of letters between the parties evidenced the fact that the favorable terms were granted as a competitive discount to equal offers made by Mobil's competitor. After May 15, 1973, the base date for price regulation, but prior to the enactment of the EPAA and the regulations issued thereunder, the two firms terminated their supplier/dealer relationship. Thereafter, the Mandatory Petroleum Allocation and Price Regulations of January 14, 1974,[13] required Mobil to re-establish the supplier/dealer relationship with Mr. Magic as it had existed in January 1972.[14] Mobil contended that the competitive situation that had prompted the initial 1970 price differentials no longer existed and that Mr. Magic should, therefore, be charged the same amounts for gasoline as others in the relevant class of purchaser, i. e., all similarly situated retailers, rather than in a separate class based on Mobil's earlier competitive allowance.

We held in *Mr. Magic* that that record was devoid of any evidence that the discounts granted Mr. Magic were cost justified to the supplier Mobil, and, further, that there is in Ruling 1975–2 no presumption of cost justification such as had existed in a prior ruling. Likewise, we find nothing in this record to indicate that the MEA which Exxon had originally granted to Merry Twins prior to the date of the termination of their supplier/dealer relationship (December 5, 1972) was cost justified to Exxon. Appellants urge that an October 5, 1972, letter signed by Exxon's Regional Manager (Plaintiffs' Exhibit 391) provided support for their claim of cost justification. However, the proposal contained in that letter was never adopted by the parties and, further, the letter entered the scene in the

---

11. It should be noted here that only about 75% of Exxon's independent dealers in the New York City district were receiving the MEA or rebate.

12. 596 F.2d 1023 (Em.App.1978).

13. See fn. 3, *supra*.

14. It is noted here that the opinion in *Mr. Magic Car Wash, Inc. v. Department of Energy*, 596 F.2d 1023, 1026, Line 3 erroneously refers to the base price date as the base period for determining the right of an independent operator to receive gasoline from his supplier. That Line 3 in *Mr. Magic* should be corrected to read "in January 1972 . . . . etc."

closing days of the supplier/dealer relationship which we are here called upon to assess. The proposal contained therein was not adopted. On the contrary, Merry Twins gave notice of the termination of the supplier/dealer relationship.

Merry Twins was not a dealer in Exxon products on May 15, 1973, the base date for price regulation. The district court found that, on the resumption of their previous supplier/dealer relationship, Exxon properly placed Merry Twins in the appropriate class of purchasers, i. e., all Exxon retail dealers who were purchasing gas from Exxon's Brooklyn terminal. This was effected in March 1974, pursuant to the mandate of the EPAA and its regulations thereunder. At that time all MEA's had been terminated in the New York City district.

The gas shortage of 1973 had ended the competition for the independent dealer outlets. The Government in May had called for voluntary allocation regulations. Congress had passed the EPAA which, in turn, spawned Ruling 1975–2 from which we quote:

> . . . such dramatic changes in the pricing and competitive structure of the petroleum industry took place during the summer and fall of 1973 that *it is unlikely, at least in the absence of FEA price controls, that a supplier could, at any time after September 1, 1973, justify a competitive discount if it existed exclusively on the basis that it was necessary to meet a lower offer made by a competitor on or before May 15, 1973.* (Emphasis supplied.)

The district court here found no evidence of cost justification to Exxon but, rather, found that the MEA which Merry Twins had enjoyed prior to December 5, 1972, was based upon competitive conditions in the market place. The court further found that Exxon, on Merry Twins' return to the Exxon brand, placed Merry Twins in the appropriate class of purchaser, i. e., that of all retail gasoline dealers receiving motor fuel from Exxon's Brooklyn terminal. The court further found that Exxon properly terminated all MEA's in the New York City district on August 14 and 15, 1973. These findings were all fully supported by the evidence in the record. The findings were not clearly erroneous and we affirm the judgment of the district court.

AFFIRMED.