REYNOLDS INDUSTRIES,
INC., Plaintiff,

v.

MOBIL OIL CORPORATION, Defendant.

Civ. A. No. 79–1917–G.

United States District Court,
D. Massachusetts.

Aug. 24, 1983.

Marc A. Reardon, Bingham, Dana & Gould, Boston, Mass., Steven Schaars, Collier, Shannon, Rill & Scott, Washington, D.C., for plaintiff.

Robert Gault, Sharen Litwin, Louise Sawyer, Mintz, Levin, Cohn, Glovsky & Popeo, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER FOR SUMMARY JUDGMENT

GARRITY, District Judge.

This is an action brought pursuant to Section 210 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 (1973), the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 751 *et seq.*, and the Mandatory Petroleum Price Regulations which were promulgated pursuant to the Emergency Petroleum Allocation Act of 1973, 10 C.F.R. § 212. Plaintiff Reynolds Industries, Inc., operates several retail gasoline stations in the Boston area. Defendant Mobil Oil Corporation sold gasoline to Reynolds' stations. Plaintiff brought this action in 1979, and was granted leave to file an amended and supplemental complaint in 1980, seeking to recover alleged overcharges and an award of damages resulting from Mobil withdrawing certain price discounts on the gallons of gasoline it sold to Reynolds. The parties engaged in protracted discovery and filed comprehensive briefs relating to the defendant's motion for summary judgment, which the court heard on July 28, 1983.

Some time prior to May 15, 1973, through January of 1981, the defendant sold gasoline to gas stations owned and operated by the plaintiff. The number of plaintiff's gas stations being supplied by the defendant oil

company during this period varied from three to seven. Prior to September of 1979, seven of plaintiff's gas stations were receiving a 3.25 cents-per-gallon discount from defendant's dealer tank wagon prices. In September, 1979 Mobil withdrew the 3.25 cent discount. Plaintiff contends that Mobil's elimination of the discount in 1979 violated the Mandatory Petroleum Price Regulations, resulting in Mobil charging Reynolds prices in excess of lawful prices after September, 1979. Defendant contends that its withdrawal of the discounts was not only lawful under the Price Regulations, but was required by the Robinson-Patman Act, 15 U.S.C. §§ 13–13b, 21a (1976). Plaintiff's amended and supplemental complaint seeks an injunction against Mobil's elimination of the discount and treble damages for the resultant alleged overcharges.

 The issue in this case is whether the allowances Mobil granted Reynolds' gas stations were customary price differentials which Mobil was required by law to maintain, or whether they constituted competitive allowances, which the regulations allowed Mobil to eliminate when competitive conditions changed in 1979. As the party seeking summary judgment under Fed.R. Civ.P. 56, Mobil bears the burden of affirmatively demonstrating that, with respect to every essential issue of each count in the complaint, there is no genuine issue of material fact. *Mack v. Cape Elizabeth School Board,* 1 Cir.1977, 553 F.2d 720, 722. This is true even with regard to issues on which plaintiff Reynolds would have the burden of proof should the case go to trial. *Ramsay v. Cooper,* 1 Cir.1977, 553 F.2d 237, 240–41 n. 8; *Adickes v. S.H. Kress & Co.,* 1970, 398 U.S. 144, 159–161, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142. At the same time, the plaintiffs have an affirmative duty to show that there is a genuine issue of material fact for trial and conclusory allegations, if not supported by facts, do not create an issue which should be reserved for trial. Fed.R.Civ.P. 56(e); *Over the Road Drivers, Inc. v. Transport Insurance Co.,* 1 Cir.1980, 637 F.2d 816, 818–819. This is true even if the conclusory allegations are

set forth in an affidavit. *United States v. Kenealy,* 1 Cir.1981, 646 F.2d 699, 706.

The focus of this lawsuit is on the Department of Energy's Mandatory Price Regulations, which were promulgated pursuant to the Emergency Petroleum Allocation Act. These regulations expired in January, 1981 when President Reagan issued Executive Order 12207, exempting crude oil and refined petroleum products, including gasoline, from price and allocation regulations. Before deregulation of this industry, the general rule provided that:

> A refiner may not charge to any *class of purchaser* a price for a covered product in excess of the *maximum allowable price* ...

10 C.F.R. § 212.83(a)(1) (emphasis added). The regulations defined the "maximum allowable price" to be:

> [T]he weighted average price at which the covered product was lawfully priced in transactions with the *class of purchaser* concerned on May 15, 1973, computed in accordance with the provisions of [10 C.F.R.] § 212.83(a) ...

10 C.F.R. § 212.82 (emphasis added). "Class of purchaser" under the regulations meant:

> [P]urchasers to whom a person has charged a comparable price for comparable property or service pursuant to *customary price differentials* between those purchasers and other purchasers.

10 C.F.R. § 212.31 (emphasis added). Finally, the regulations defined "customary price differential" as follows:

> "Customary Price Differential" includes a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery.

10 C.F.R. § 212.31.

This regulatory scheme provided that sellers such as Mobil could charge prices for gasoline which reflected selling prices as of May 15, 1973 and a dollar-for-dollar pass-through of the amount by which the seller's costs had increased since that time. The

regulations required the sellers to determine what different classes of purchasers they were selling to on May 15, 1973, what were the criteria which separated those classes on May 15, 1973, and in which class each of the sellers' customers belonged. The purpose of the regulatory scheme was to maintain the price differentials that existed on May 15, 1973 between groups of purchasers which were not similarly situated at that time and which remained not similarly situated. *See* Federal Energy Administration ("FEA") Ruling 1975–2, 40 Fed.Reg. 10,655 at 10,656 (1975). The Price Regulations required the sellers to group together similarly situated customers in a single class of purchaser and to establish a single weighted average price for the product sold to all those customers as of May 15, 1973. The term "class of purchaser" is defined in terms of customary price differentials, so the regulatory scheme requires the sellers to consider the different prices they were charging their customers on May 15, 1973 and determine which price differentials on that date were customary price differentials as distinguished from those which "simply reflect the varying competitive situations at the various times when contractual prices were agreed to." FEA Ruling 1975–2, *supra,* at 10,657. The differentials which reflect varying competitive situations are referred to as "competitive allowances."

Mobil contends that Reynolds' stations are all members of the class of purchasers which includes all retail dealers regularly receiving gasoline from Mobil's East Boston terminal. It is Mobil's position that the 3.25¢ per gallon discounts which Reynolds' stations were receiving on May 15, 1973 were competitive allowances. Reynolds contends that the discounts were customary price differentials and that Reynolds' stations were not similarly situated when compared with the other retail dealers receiving gasoline from Mobil's East Boston terminal. In essence, Reynolds seeks to establish that Reynolds' stations constituted a separate class of purchaser. It is possible for a class of purchaser to have only one member, "particularly at the end-user level, where a

price to a very large volume end-user was often determined on an individually-negotiated basis and reflected a customary price differential between that end-user and all other end-users." FEA Ruling 1975–2, *supra,* at 10,659. Reynolds' stations are of course retail dealers, not end-users of gasoline, but it is possible that a group as small as the seven Reynolds gas stations, or the three stations which were in existence and buying from Mobil on May 15, 1973, could constitute a separate class of purchaser.

In evaluating the competing positions of the parties it is helpful to consider the history of the regulatory and judicial decisions which have sought to distinguish customary price differentials and competitive allowances. The first major interpretive release issued by the Federal Energy Office ("FEO") made it clear that each seller must establish "classes of purchaser" and set one base price for each class:

> A class of purchaser is, therefore, the smallest unit for which a uniform selling price may be computed because, by definition, no customary price differentials exist within a class of purchaser.

FEO Ruling 1974–17, 39 Fed.Reg. 21,043 (1974). The second major interpretive release established a presumption, stating the FEO position that "any discount that was in effect on May 15, 1973, and that had either been in effect or had been granted for a period of six months or more, [would be generally regarded by the FEO] to be a customary discount." FEO Ruling 1974–18, 39 Fed.Reg. 21,033 at 21,044. While the presumption could be "rebutted [by sellers] in particular situations by [an] appropriate factual showing," *id.,* FEO Ruling 1974–18 placed significant emphasis on the duration of a discount, distinguishing a temporary discount intended to remain in effect only as long as a price war continued from a discount granted by a seller as a "competitive discount or allowance" which was offered a high volume retailer in a favorable location, which was established "for an indefinite period," subject to discontinuance by the seller. *Id.* at 21,043.

Rulings 1974–17 and 1974–18 caused some difficulties, so the FEA issued Ruling 1975–2 "to clarify further the application of the class of purchaser concept by supplementing Rulings 1974–17 and 1974–18." 40 Fed.Reg. at 10,655. Ruling 1975–2 is the most complete and recent official pronouncement of the agency concerning the proper interpretation of "customary price differential." It sets out much more detailed guidelines and procedures for distinguishing competitive allowances from customary price differentials and states that "[t]o the extent that there is any inconsistency between this ruling and those earlier rulings, this ruling will be controlling." *Id.* Ruling 1975–2 states that the important factors to be considered in making class of purchaser determinations are: 1) Location, 2) Type of Purchaser, 3) Volume, and 4) Term or condition of sale or delivery; and those factors are to be considered in that order.[1] *Id.* at 10,657.

The location factor refers not to the location of the buyer, but the various locations from which the seller distributes its product. Mobil followed the first two prongs of the ruling and placed all retail dealers (type of purchaser) regularly receiving gasoline from Mobil's East Boston terminal (location) in the same class of purchaser.

■ Reynolds contends, however, that the high volume sold to Reynolds, its superior credit rating, the strategic significance of the location of its stations, and cost savings to Mobil of dealing with Reynolds were the factors which led to the discount, so Reynolds' stations must be placed in a separate class of purchaser. If Reynolds can show that a substantial difference in its volume vis-a-vis the other retail purchasers from the East Boston terminal was a significant motivation behind the granting of the 1973 discount, the discount would constitute a customary price differential. In our view, if Reynolds could establish that its stations' high volumes and the other factors, such as cost savings to Mobil from Reynolds' good

credit rating, can be objectively verified as having been significant factors which led Mobil to conclude in 1973 that Reynolds' stations were not similarly situated and were therefore entitled to a discount on the retail price charged at the East Boston terminal, then the discount constitutes a customary price differential which the regulations required to be continued.

Mobil contends that Reynolds must make a stronger showing. Mobil's view is that FEA Ruling 1975–2 established that the Petroleum Price Regulations must be interpreted consistently with the requirements of the Robinson-Patman Act, so that unless Reynolds can show that the discount was cost-justified under Robinson-Patman standards, the discount can be withdrawn by Mobil. There is some support for Mobil's view.

One of the reasons for the issuance of Ruling 1975–2 was the FEA's awareness of "certain specific kinds of circumstances which involve Robinson-Patman Act considerations, and which are known to be the source of particular difficulty." *Id.* at 10,-656. There is a potential conflict between the Robinson-Patman Act ("R–P Act") and the Price Regulations. The Price Regulations mandate that sellers must charge different prices to different classes of purchaser. Section 2(a) of the Clayton Act, as amended by the R–P Act, provides in pertinent part that:

> It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them . . . .

15 U.S.C. § 13(a). The R–P Act, therefore, prohibits sellers from charging different prices to competing retailers when the retailer charged the lower price receives the

---

**1.** Grade and quality are also extremely important factors to be considered, but all of the product at issue in this case is of like grade and quality, so that provides no basis for establishing separate classes of purchaser in this case.

benefit of the lower price knowingly and the effect of the price difference may be substantially to lessen competition. Two affirmative defenses available to a price discriminating seller are the cost justification defense:

> That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered ....

and the meeting competition defense:

> [N]othing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price ... was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

15 U.S.C. § 13(a) & (b). The potential conflict between the Price Regulations and the R–P Act is that if the Price Regulations mandate that a seller grant a retailer a price discount under circumstances when the seller does not qualify for the meeting competition defense or the cost justification defense, the Price Regulations may mandate a violation of the R–P Act.

To protect against that risk, sellers obtain "competitive letters" whenever possible. A competitive letter is a written statement or affidavit from a buyer that he has received an offer from one of the seller's competitors at as low a price and on similar terms as the price and terms offered by the seller. These letters satisfy the seller's burden of showing a good faith belief that he is meeting but not beating the price of a competitor. *See generally* ABA Antitrust Section, Monograph No. 4 (Vol. I), The Robinson-Patman Act: Policy and Law 123–124 (1980). The seller is prohibited by the Sherman Act from exchanging price information with competitors for the purpose of verifying the terms offered by those competitors. *See United States v. United States Gypsum Co.,* 1978, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854; *Great Atlantic & Pacific Tea Co. v. Federal Trade Commission,* 1979, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153.

As FEA Ruling 1975–2 points out, sellers often obtain competitive letters from all their customers to protect themselves from R–P liability, but that does not necessarily mean that the competitive offer was the factor motivating the seller to offer a discount. The seller may decide to grant a discount because the discount is cost justified, and still the seller may require the buyer to execute a competitive letter affidavit as protection against a R–P suit. FEA Ruling 1975–2, *supra,* at 10,658 ("certain discounts may have been 'competitive discounts' in form, having ostensibly been granted to meet a lower offer and with an affidavit having been executed by the buyer to that effect, but may nevertheless also be cost justified under the Robinson-Patman Act"). Then, if sued, the seller will defend under both the meeting competition and cost justification defenses. The competitive letter is needed as insurance, even if the discount is cost justified, because the cost-justification defense has been interpreted so narrowly that it is virtually impossible for a seller to satisfy its requirements.[2]

In this case, it is Mobil's position that the discount was offered solely to meet competitors' offers to Reynolds and in 1979, when gasoline was in such short supply, Mobil's competitors were not making any competitive offers to Reynolds, so Mobil could not get a competitive letter from Reynolds and the discount was no longer justified by competitive conditions.

---

**2.** R.A. Posner, The Robinson-Patman Act: Federal Regulation of Price Differences 40–41 (1976) ("[T]he defense has been so interpreted and applied as to make it virtually impossible for firms to justify price differences on the basis of cost differences. Items of genuine economic cost are excluded under arcane and unrealistic cost-accounting principles .... Thus, the act has in practice undoubtedly operated to suppress price differences that were justified by differences in cost.") *See also* Department of Justice Report on the Robinson-Patman Act 22 (1977).

Mobil argues that Ruling 1975–2 mandates that Reynolds must satisfy the requirements of the cost justification defense under the R–P Act in order to show that the discount was a customary price differential. However, while Ruling 1975–2 states that the FEA "will take into account whether the differential in question falls into one of the categories of differentials justified under the Robinson-Patman Act," the Ruling makes it clear that Reynolds must only show that its stations were "sufficiently distinguishable" from the other retail dealers receiving gasoline from Mobil's East Boston terminal "in terms of location, type of purchaser, volumes of product purchased, terms and conditions of sale (other than the 'competitive' discount in question), or any other objective standard which would serve to differentiate the buyers which received discounts from those which did not." *See* FEA Ruling 1975–2, *supra,* Example 8 at 10,660. While the FEA sought to make the Price Regulations consistent with the R–P Act, to require a showing of cost justification under R–P standards as a prerequisite to the existence of a customary price differential would defeat the entire statutory purpose of continuing price differentials between groups that were not similarly situated. Even if the sellers in 1973 had sufficiently detailed cost accounting data which satisfied the requirements of the R–P Act, which would be extremely rare, to require the buyers to prove that defense through discovery of the sellers' records in situations where the sellers are seeking to disprove the existence of the defense would mean that the position of the sellers would be the last word. No buyer could establish that his seller's characterization of a price difference as a competitive allowance and not a customary price differential was in error.

Buyers do not have to go that far. In our judgment, a buyer merely has to show that he received a price discount from the seller not just because of the competitive situations at the various times when they entered into contracts, but rather because of factors which "can be objectively verified" as having indicated that the buyer was not

similarly situated with the other buyers that the seller wants to group together in one class of purchaser. *See* FEA Ruling 1975–2, *supra,* at 10,657. If the discount can be explained as a competitive allowance but can also be shown to have been given because of other factors like the large volume purchased vis-a-vis other buyers, the regulations require that the discount be continued as a customary price differential. *Id.* at 10,658. *See also Pacific Serv. Stations Co. v. Mobil Oil Corp.,* Temp.Emer.Ct. App. 1980, 636 F.2d 306, 309 n. 4, 310.

■ Mobil has presented evidence that in 1974 Mobil established as a single class of purchaser all retail dealers who purchase gasoline regularly from the East Boston terminal and, from that time on, Mobil treated the price differences between those dealers which existed on May 15, 1973 as competitive allowances when they computed the proper prices to be charged under the regulations.

Mobil contends in substance that it has always viewed the discounts granted Reynolds' stations as competitive allowances which were not cost-justified, but from the date when the regulations first became effective through 1976 Mobil continued to give Reynolds the discounts because of the uncertainty which existed concerning the proper interpretation of the regulations; that it was not until after Ruling 1975–2, when the United States District Court for the Western District of Pennsylvania issued an opinion granting Mobil's motion for summary judgment in a case brought by a Mobil dealer, Mr. Magic Car Wash, Inc., that the uncertainty surrounding the withdrawal of competitive allowances was cleared up to Mobil's satisfaction, *see Mr. Magic Car Wash, Inc. v. Mobil Oil Corp.,* 3 Cir.1977, 556 F.2d 567 *aff'd,* Temp.Emer.Ct. App.1978, 596 F.2d 1023; that after the *Mr. Magic* decision was issued, Mobil began terminating the discounts which it had believed all along were competitive allowances, but continued the discounts to Reynolds' stations because it feared that Reynolds would change suppliers if the discounts were not continued. Then, in 1979, during

the Oil Crisis, there were no other sellers threatening to offer Reynolds' stations a lower price, so it was no longer necessary for Mobil to grant the 3.25¢ discount to Reynolds and the discount, in Mobil's view a competitive allowance, was discontinued. Mobil has presented affidavits and other evidence in support of all aspects of its position.

Plaintiff's view of the facts is quite different. Reynolds contends in substance that Mobil granted Reynolds the 3.25¢ discount in 1972 because Mobil achieved significant cost savings when selling to Reynolds when compared with Mobil's costs when it sold to other retail dealers receiving gasoline from the East Boston Terminal; and that the cost savings were due to the desirability of the locations where Reynolds' stations were situated, the large volume of gasoline purchased by Reynolds, Reynolds' good credit rating, and Reynolds' success in operating stations in areas where Mobil had experienced difficulty entering the market.

Reynolds' evidence in support of its position is as follows: *First,* an interoffice memorandum dated December 2, 1977 from Mr. W.D. Johnson, a manager of the Boston Resale District for Mobil. Mr. Johnson speaks of 1) Reynolds' stations being located in "very agressive markets" where Mobil had been unable to operate its own stations, 2) Reynolds' excellent credit history, 3) that Reynolds' stations had been "very agressive street competitor[s]", and 4) that Reynolds' stations provided "Mobil with important representation in ... difficult markets." *Second,* affidavits[3] by Reynolds' President Philip Reynolds and Vice-president David Reynolds to the effect that Mobil granted Reynolds discounts because the discounts were cost-justified. *Third,* Reynolds' affidavits state that on each occasion when the amount of the discount was negotiated Mobil did not receive competitive letters from Reynolds until after the negotiations were complete. Reynolds contends that this demonstrates that the discounts were not granted as a result of competitive conditions. *Fourth,* while FEA Ruling 1975–2 removed the presumption that discounts in effect for the six-month period prior to May 15, 1973 were customary price differentials, that ruling also said that the duration of the discount may have evidentiary value in distinguishing random price differences from longer-term customary price differentials. FEA Ruling 1975–2, *supra,* at 10,-658–10,659. So, Reynolds argues that the longer-term nature of Reynolds' contracts with Mobil demonstrates that the discounts were cost justified to Mobil.

In our view, Mobil has demonstrated that there is no genuine issue as to any material fact and is therefore entitled to judgment as a matter of law. Reynolds has failed to come forth with any evidence that Reynolds' stations were not similarly situated with regard to other retail dealers who bought gasoline from Mobil's East Boston terminal. All service stations differ in terms of volume sold, credit rating, and commercial success. At issue in this case is whether Reynolds was objectively in such a different situation when compared with the other retail dealers purchasing from East Boston that Mobil granted Reynolds a discount for that reason in 1973. Mobil has produced significant evidence that, upon learning of competitive offers to Reynolds' stations in 1972, Mobil performed financial and marketing analysis of the competitive conditions facing Reynolds' stations and decided to meet those offers. Reynolds has submitted no contrary evidence concerning Mobil's pricing practices on or before May 15, 1973. *See Champlin Petroleum Co.,* Dept. of Energy 1979, 4 DOE ¶ 80,101 at 80,509. The fact that Mobil granted the discounts in negotiated contracts which covered a period greater than a year does not refute Mobil's position. *Compare Mobil Oil*

---

**3.** Defendant filed a motion to strike these affidavits and both parties submitted memoranda of law in support of their respective positions. At the court's request, the defendant also filed redacted copies of the affidavits, underlining and bracketing specific portions which defendant argued should be stricken. However, in view of our substantive rulings in this memorandum, we do not reach defendant's motion to strike and a line-by-line ruling on the affidavits would be superfluous.

*Corp.*, "Notice of Probable Violation," Department of Energy, December 12, 1979 at 30, 35 (DOE decided not to challenge Mobil's class of purchaser structure which put all retail dealers buying from a single terminal in one class even though in 1973 Mobil executed standard form contracts of at least one year's duration with each of those dealers and those contracts established different prices for different dealers.)

The letters from Mr. Johnson establish that Mobil viewed Reynolds' stations as good customers and Mobil was desirous of keeping Reynolds' business. That does not provide significant support for Reynolds' claim that Mobil granted the discounts at issue because of cost savings to Mobil. Mobil would not be expected to meet competitive offers made to poor customers. In addition, since Mobil has produced evidence that it was very aware of what competitive offers Reynolds had received before Mobil decided whether to continue the discount to Reynolds, see, e.g., Mr. Johnson's March 1, 1976 letter, the fact that Mobil did not receive the written confirmation of those offers until after negotiations were completed is irrelevant.[4]

The only evidence Reynolds can produce is the affidavits of its officers stating their belief that Mobil granted Reynolds the discounts because of cost savings and hearsay statements quoting unidentified "Mobil representatives" as having told Reynolds the discounts were cost justified. Despite the exhaustive discovery that has taken place since this case was filed in 1979, Reynolds has been unable to produce any comparative data showing Reynolds purchased a greater volume than the other retail dealers buying from Mobil's East Boston terminal. Similarly, Reynolds has produced no comparative evidence concerning credit ratings or any other characteristics of service stations which would support its contention that its stations were not similarly situated vis-a-vis the other retail dealers. *See Sardo v. Gulf Oil Corp.*, D. Mass. July 7, 1982, Civil Action No. 80–1481–MA, slip op. at 3

and cases cited therein. Conclusory allegations and speculation do not raise a genuine issue of material fact. In our opinion, plaintiff has shown nothing more. Accordingly, it is ordered that the defendant's motion be granted and summary judgment be entered for the defendant.

---

4. Both parties stated at oral argument and we therefore assume that the only reason for the written competitive letters was to protect Mobil in the event of a R–P Act case.