Samuel J. **LEFRAK** et al., Plaintiffs,

v.

**ARABIAN AMERICAN OIL COMPANY et al., Defendants.**

No. 74 C 1700.

United States District Court, E. D. New York.

Jan. 10, 1980.

Berger & Montague, P. C. by David Berger, Stanley R. Wolfe, Philadelphia, Pa., Jerome Edelman, P. C. by Jerome Edelman, Brooklyn, N. Y., Richard S. Lefrak, Forest Hills, N. Y., for plaintiffs.

White & Case by Thomas Kiernan, Frederic S. Newman, New York City, for Arabian American Oil Co.

Sullivan & Cromwell by Robert M. Osgood, Kenneth M. Bialo, New York City, for Exxon Corp.

Lord, Day & Lord by Gordon B. Spivack, Thomas D. Brislin, New York City, for Standard Oil Co. of California.

Olwine, Connelly, Chase, O'Donnell & Weyher by William F. Sondericker, New York City, for Asiatic Petroleum Corp. (renamed Scallop Corp.).

Donovan, Leisure, Newton & Irvine by Sanford M. Litvack, New York City, for Mobil Oil Corp.

Lawrence R. Jerz, White Plains, N. Y., Kaye, Scholer, Fierman, Hays & Handler by Randolph S. Sherman, New York City, for Texaco, Inc.

Kissam, Halpin & Genovese by Anthony Genovese, Joel H. Blumkin, New York City, for Gulf Oil Co.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

In 1974, the plaintiffs, a group of home heating oil consumers (collectively referred to as "Lefrak"), brought a civil antitrust action to recover treble damages for overcharges due to price-fixing by the defendants, the major oil suppliers in the United States (collectively referred to as "Aramco").[1] Over a period of five years, the court oversaw a series of complicated legal stratagems which often raised new legal issues. The parties engaged in extensive discovery and settled into a long and extremely hard fought battle during the course of this litigation. On the eve of trial, and after such a brilliant exhibition of legal acumen and professionalism, a significant assembly of facts unravels itself before the court. Now, the saga has culminated not with trial but with a voluminous defense motion for summary judgment involving a controlling legal issue. As a result of the decisive nature of that issue, Lefrak's case has been halted as if by a wall—an *Illinois Brick* wall.[2]

■ Aramco contends by its motion that Lefrak is barred by the principles of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) ["Illinois Brick"]. That decision holds that as a matter of law an indirect purchaser of goods is not entitled to sue for damages under the

---

1. The defendants are: Arabian-American Oil Company; Asiatic Petroleum Corporation; Exxon Corporation; Gulf Oil Corporation; Mobil Oil Corporation; Royal Dutch Petroleum Company; Shell Petroleum, N.V.; Standard Oil Company of California; Texaco, Incorporated; The Shell Petroleum Company, Limited; and The Shell Transport and Trading Company, Limited.

2. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

antitrust laws. Aramco had previously moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on the basis of *Illinois Brick*. Lefrak survived that motion by amending its complaint, by leave of court, to allege an exception to *Illinois Brick* in that Aramco was controlling prices through so-called "pre-existing cost-plus contracts."[3] Thereafter, the parties engaged in an extended period of discovery predicated upon the existence of cost-plus contracts. Aramco's motion, and Lefrak's opposition to it, hinges upon that issue.

Aramco argues that Lefrak is an indirect purchaser, who did not buy oil from the defendants, and who did not purchase oil on the basis of pre-existing cost-plus contracts. Aramco contends that the same considerations presented in *Illinois Brick* exist here and require a summary judgment disposition.

Lefrak alleges that material issues of fact exist as to both its indirect purchaser position and the existence of a cost-plus contract. It presses the court to leave the resolution of those issues to the jury. Basically, Lefrak asserts that since it views the same contracts presented by Aramco in a different light, the court must deny Aramco's motion. Thus, Lefrak would have the jury determine the ultimate legal issue of the case.

The court finds that it must grant Aramco's motion for summary judgment. Lefrak's simple, broad and conclusory allegations, despite the persistence of Lefrak's urgings, are insufficient to overcome that motion. After five years of almost continuous activity, every avenue of discovery has been exhausted. Yet, the facts before the court indicate that Lefrak was an indirect purchaser who did not buy fuel oil through pre-existing cost-plus contracts. Accordingly, Lefrak cannot prevail, as a matter of law, under the principles of *Illinois Brick*. Any prior reluctance of this court to dismiss pursuant to Fed.R.Civ.P. 12(c) has disappeared in light of the long period of discovery and Lefrak's inability to demonstrate a factual basis for its claim sufficient to raise a material issue of fact.

## I. THE FACTUAL BACKGROUND

Lefrak is a group of large housing complexes which does business in the New York City metropolitan area. During the years 1968 to 1974 it purchased heating oil to fuel the furnaces in the housing complexes.[4]

Aramco represents the large oil suppliers ("suppliers") who supply the national market for petroleum products at the top end of the distribution chain. Aramco's heating oil market includes direct wholesale distribution to distributors, and in turn, indirectly includes a retail market between distributors and consumers. Through a complex process, it obtains oil from foreign oil producers ("producers").[5] Aramco converts its purchase and business costs into a marketing price and offers its products to independent distributors who resell it on the retail market.[6]

During the period in question, Lefrak consumed between 11 million and 15 million

3. The amended complaint alleges six causes of action. The first cause of action alleges a claim for damages and injunctive relief under the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1, 15, 26, on the grounds that the defendants conspired to fix the price of home heating oil. Count Two alleges a violation of 15 U.S.C. § 8. Counts Three and Six are based on pendent jurisdiction to the first two counts and allege a violation of New York State's Donnelly Act, New York General Business Law § 340. Counts Four and Five are also based on pendent jurisdiction and allege intentional tortious conduct.

4. Although Lefrak purchased # 2 and # 4 quality fuel oil, the contracts which are the focus of the issues here were for # 6 quality fuel oil.

5. While the effect of domestic oil production is apparently not in issue, the court will assume that the allegations of the complaint extend to it.

6. Each supplier set its own price in different ways. The pricing process was complicated by place of purchase, supply, quality of product and demands of the market. Thus, the price of one supplier varied from the posted price of another supplier. [See Defendant Reply App. Exh. A].

gallons of oil for each of the relevant years. These large quantities made Lefrak an unordinary consumer. As a result, Lefrak entered into large quantity contracts of a requirements nature to insure a steady supply of heating oil at a predictable and cost-efficient price.

Lefrak had four major distributors. They were Whaleco Fuel, formerly known as Whale Oil ("Whaleco"), Howard Fuel ("Howard"), Premium Coal & Oil ("Premium") and Castle Coal & Oil ("Castle"). These distributors purchased their fuel oil from suppliers on the open market, and resold the oil to Lefrak pursuant to contract. Thus, a distribution chain, marked by independent and readily definable levels, existed beyond the production stage. For this case, that distribution chain is as follows:

oil suppliers $\xrightarrow[\text{market}]{\text{wholesale}}$ $\xrightarrow[\text{distributors}]{\text{independent}}$ $\xrightarrow[\text{market}]{\text{retail}[7]}$ consumers

The facts before the court lead to certain conclusions about the distribution process. First, Aramco did not supply Lefrak and Lefrak did not purchase directly from Aramco. Rather, an intermediate link existed in the distribution chain between the oil suppliers and the oil consumers. Second, the oil suppliers dealt at arms length with the distributors. The distributors were not owned or controlled by the producers, and were free to set prices with their customers on the basis of their own profit goals and cost demands. Where one distributor was unwilling or unable to meet a customer's supply needs or price demands, there was a competing distributor ready to fill the gap in the market structure. *See e. g.* Plaintiff's Exhibits Vol. II, Carini Affidavit ¶ 13. Thus, the distributor's price to its customer was a result of an independent decision in a competitive market.[8]

Lefrak's consumption of oil and its relationship to this distribution chain is reflected in its contracts with the distributors during the years 1968–1974. Both Lefrak and Aramco point to those contracts but give different interpretations of them and draw different conclusions from them. Since the court's understanding of the contractual terms and meanings and their relationship to the market structure will be decisive, the court must focus on those contracts.

In a sense, the Lefrak contracts represent a return to the "good old days" when oil supplies seemed plentiful and prices incredibly low by present standards. Those contracts reflect an enviable pattern of stable supply and price which was interrupted by the 1973 oil embargo induced by the foreign oil producers. The post-1973 contract reflects the market changes, and an emphasis in the Lefrak organization on the efficient use of fuel oil. Despite the apparent simplicity of the contracts or the availability of supply in a stable market, however, the facts before the court indicate that hard negotiation and practical concerns were a benchmark for those contracts. It is important to remember throughout that Lefrak was a large consumer, and his concerns and demands were not those of a consumer on a small scale. A review of the combined exhibits will demonstrate the considerations which shaped the provisions of the contracts.

Lefrak contracted for large quantities of fuel oil. For the period 1967 to 1971 Lefrak contracted with the Whale Oil Company for an unspecified quantity of fuel oil for each of the four contract years, and in fact purchased a large quantity. For the period 1971 to 1972 Lefrak contracted with Premium for approximately 6 million gallons of fuel oil, and with Howard Oil for a similar

---

7. Under the facts of this case, the large quantities purchased by Lefrak indicate a strong bargaining position. Thus, the retail market which existed between Lefrak and the distributors most likely varied from the retail market in general.

8. As will be apparent from the court's discussion, *infra*, Lefrak's argument that the distribu-

tors were fraudulently established by the oil suppliers in order to avoid the impact of *Illinois Brick* is belied by the fact that *Illinois Brick* was rendered *after* the distribution process was firmly established. While the oil suppliers have been called many things, this court is unwilling to call them clairvoyant.

amount but at a different price[9] and under different terms. For the period 1972–73 Lefrak contracted with Whaleco for approximately 15 million gallons of fuel. For the period 1973–1974 Lefrak contracted with Castle for approximately 8 million gallons of fuel, and with Whaleco for approximately 7 million gallons but at a higher price.[10] In any given year, Lefrak required approximately 12 million gallons, and its contracts reflect that approximate consumption.[11] Lefrak contracted with those distributors which could guarantee supply at a favorable price.[12] Deft. App. Vol. II at 27–37.

Lefrak and its distributors also set pricing terms in their contracts. Both Lefrak and the distributors agreed to use either the Exxon Consumer New York Harbor barge price ("Exxon" or "barge price") or the Shell Asiatic New York Cargo Price ("Shell" or "barge price") as a reference point in the marketplace. These price indexes were readily available to the public in the New York Journal of Commerce or Platt's Oilgram, two industry journals. As to price, the contracts indicate that a price was set to cover the cost of the product. Some contracts specified an additional charge to cover profit, transportation and overhead.

The contracts also provided that the price of the fuel oil would rise or fall according to increases or decreases in the posted barge price. While the pre-1971 contracts did not indicate a limit on the amount of the increase, the post-1971 contracts indicate that a limit of 95% of the increase would be added to the price of the product. No provision was made concerning the amount of decrease in price, although pro-rata reduction provisions were included in some contracts.

The barge prices, however, were not invariably tied to actual prices and costs. They were instead an indicator used by the parties to estimate costs and negotiate prices. Defendant's Reply App. Exh. A, B. Thus, the ultimate contract prices were not identical to the posted barge prices. This was because different pressures came to bear on both suppliers and distributors in

**9.** Arthur Klein, Lefrak's executive vice-president, indicated that a variation in a contract price of thousandths of a cent was significant and could account for sizable savings when millions of gallons were purchased. Deft. App. Vol. II at 31. Thus, he indicated the desirability of negotiating with many distributors to obtain the lowest price for a stable supply. Deft. App. Vol. II at 27–37.

**10.** Lefrak was unable to determine its exact fuel requirements in advance of any given year. Although Lefrak's housing stock remained stable, and housing codes required a minimum temperature for the buildings, Lefrak's needs fluctuated with the quality of oil used and the severity of the weather conditions for any particular heating season. Pltf. Exh. Dec. 7, 1979, Klein Affidavit, Exh. B. Lefrak could, however, approximate its potential consumption by using the previous consumption for the same or similar housing stock. In that way, Lefrak could insure a continuous supply from its distributors.

**11.** The consumption of fuel oil by Lefrak for the period in question was, in gallons, as follows:

| | |
|---|---|
| 1968 | 12,586,000 |
| 1969 | 12,474,000 |
| 1970 | 12,899,000 |
| 1971 | 12,947,000 |
| 1972 | 14,661,000 |
| 1973 | 13,446,000 |
| 1974 | 11,949,000 |

Pltf. Dec. 7, 1979, Exh. B–3.
In comparison, Lefrak contracted for the following:

| | (Contractual Provision) |
|---|---|
| 1967–1968 | unspecified |
| 1968–1969 | unspecified |
| 1969–1970 | unspecified |
| 1970–1971 | unspecified |
| 1971–1972 | 12,000,000 |
| 1972–1973 | 15,000,000 |
| 1973–1974 | 15,000,000 |

**12.** With the prospect of uncertain supplies due to the 1973 oil embargo, Lefrak reserved the right to purchase oil from other distributors in its 1973–74 contract with Castle (Plaintiff's Exhibits Vol. I, Exh. A–2), and reserved the right to purchase up to 4 million gallons of fuel oil from other distributors in its 1973–74 contract with Whaleco. Plaintiff's Exhibits Vol. I, Exh. A–1. Arthur Klein considered such clauses to be excellent hedges against the whimsy of distributors, and a way to insure flexible supplies. Deft. App. Vol. II. Similarly, the early Whale contracts did not specify a quantity to allow Lefrak to maintain flexibility in the market should better prices arise.

their respective positions in the marketplace. A supplier's costs and prices could vary from the posted barge price of another supplier which was used as a reference point for a contract. Similarly, the distributors were faced with economic conditions that could vary the actual price from the barge price. Thus, competitive edges and other business concerns allowed for variations in the prices ultimately placed in the contract and paid by Lefrak. Deft. Reply App. Exh. B.

Another reason for the fluctuations in price was the absence of any requirement in the industry to follow any barge price in reaching a contract price. Indeed, the barge price did not reflect the individual market positions of the distributors or suppliers. Contractual arrangements, though indexed to the barge prices as a bargaining and reference point, varied with market conditions and the bargaining position of the distributor and its buyer.[13] Deft. App. Vol. II 37–38; Deft. Reply App. Exh. A, B.

The relative simplicity of the contracts and the convenient indexing system for pricing are belied by the actual contract negotiations that continued throughout the contract period. Moreover, although the contracts were similar in general format, there were notable variations in some.

For example, the pre-1971 contracts with Whale included provisions which allowed Lefrak to purchase up to 2.5 million gallons of fuel oil at a price referenced to the contract price at the date of purchase. Thus, Lefrak could purchase and accept large quantities of oil and avoid the costs of subsequent increases.[14] Deft. App. II at 20. In the 1972–1973 period, Lefrak contracted to purchase its year's requirements from Whaleco. That contract differed from the others by setting a *maximum* annual price over which further increases would not be

added. Thus, unanticipated price or cost increases created a risk of loss for the distributors. *See* Deft. App. Vol. II at 55–60.

The contracts were executed in a competitive market of large distributors. Each distributor negotiated with the suppliers on the price of the product. Thus, their purchase price was not inexorably tied to a prevailing barge price. Rather, the price varied with market conditions and bargaining strength.

In turn, Lefrak, as a large consumer, commanded a favorable bargaining position, which it used to its benefit. Thus, when Lefrak requested that the Exxon or Shell price be used as a reference point for negotiations, the distributors acceded to the request. When Lefrak expressed a desire for price accommodations, the distributors varied their pricing arrangements to meet its demands. Deft. Reply App. Exh. C.

Lefrak's ability to negotiate its prices was due largely to the competitive distributors' desire to gain the Lefrak contract. Deft. App. Vol. II. Thus, Lefrak negotiated for a price which it considered to be favorable. It also negotiated the actual price due under the terms of the contractual increases and sought to obtain a lower price. For example, Lefrak did not approve certain increases posted by Whaleco in 1974, and was successful in negotiating the increase downward, thereby avoiding a full pass-on of the increased fuel oil costs. Pltf. Exh. Vol. I, Exh. B; Deft. App. Vol. I, Exh. 23, 24, 25, 26.

Another example of Lefrak's bargaining position was Lefrak's ability to change distributors to its satisfaction. Thus, in 1974 Lefrak changed from Howard Fuel to Castle to gain a better price. Deft. App. Vol. I Exh. 6, 7, 8; Deft. App. Vol. II 101–102. In that year, Lefrak also switched from Castle

---

**13.** The use of a supplier's barge price as a reference point for contract negotiations is apparently the result of custom and usage in the industry, and is a commonly used indicator. For example, in *Merry Twins, Inc. v. Exxon Corp.*, 611 F.2d 874, No. 2–26 (Em.App. Dec. 19, 1979), the parties used the Texaco barge price as the reference point for their contracts.

**14.** The risk being that the price of fuel oil could decrease, thereby causing Lefrak to pay more for the fuel oil. However, while there is no indication that Lefrak suffered due to these contractual agreements, it is clear that Whaleco was harmed by them and suffered substantial losses. Deft. Reply App. Exh. C, 80–81, 97–98.

to Whaleco, and from Whaleco back to Castle in a very short period of time to gain a price and supply advantage. Deft. App. Vol. II 115–116. Thus, Lefrak negotiated its contracts independently with each distributor to gain the best service at the best price. As a result, the prices of fuel oil varied among the Lefrak distributors. Def. App. Vol. II at 118–119.

Lefrak also reserved the flexibility to seek other distributors for supply and price. (Pl. Vol. I Exh. A–1, A–2; Def. App. Vol. II 90–105). This was because Lefrak did not always meet the contractual approximation of gallonage, and was able to purchase elsewhere at a better price. (Deft. Reply App. Exh. C)

Thus, the surface clarity of the contracts is belied by the extensive negotiations conducted by the parties throughout the contracts' existence. Lefrak's position in the market allowed it to negotiate the contracts and maintain a favorable and flexible position in the marketplace. As a result, Lefrak could change distributors, purchase in addition to its contracts, and get a price that was not unalterably tied to the Lefrak-preferred barge price. Thus, it appears throughout that Lefrak's position in the market produced a favorable, if not timid, response from its distributors who sought to maintain a lucrative account. (Deft. Reply App. Exh. C) As a result, the distributors were placed in a dilemma. They could either negotiate the price downward and thereby lessen their profits and increase their risk of loss by unexpected price increases or they could maximize profits and increase prices and lose a lucrative account that sought usually one or two distributors to supply the bulk of its needs. Thus, Lefrak's market position placed it in a good position at the expense of and with risk to the distributors.

## II. THE LAW OF SUMMARY JUDGMENT

■ The principles of law applicable to a motion for summary judgment are well established. The movant must demonstrate that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).

[T]he "fundamental maxim" remains that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried . . . Moreover, when the court considers a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute . . . .

*Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975). *See also Ambook Enterprises v. Time, Inc.,* 612 F.2d 604 (2d Cir. 1979).

■ This is not to say that the non-moving party may remain idle. Simple, conclusory statements alleging the existence of a factual issue are insufficient to defeat a motion for summary judgment. *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir. 1972). The opposing party cannot withhold its evidence until trial. Rather, it must come forward with specific evidence to support its claim of a factual issue. *Beal v. Lindsay,* 468 F.2d 287 (2d Cir. 1967); *Donnelly v. Guion, supra.*

Moreover, the court is mindful of the restricted role that summary judgment usually plays in antitrust matters. *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, even in an antitrust action, Rule 56 does not "permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations . . . ." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Rather,

While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of ac-

tion be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 290, 88 S.Ct. at 1593. Thus, "courts should not be unduly reluctant to grant summary judgment when a trial would serve no useful purpose and the movant is entitled to judgment as a matter of law." 6 Moore's Federal Practice ¶ 56.02(i) at 56–25.

Thus, this court should grant a motion for summary judgment only when the record demonstrates a compelling factual situation in the setting of a controlling legal principle. That is the situation here. The parties have actively pursued this matter for five years. The exhibits submitted by both sides are substantially the same. Indeed, the controlling contracts are submitted by the defendants to disprove the plaintiff's case, while the plaintiff offers them to bolster its case against the defendants.[15] Accordingly, the court finds that under the circumstances of fact and law before it, summary judgment in favor of the defendants is appropriate.

## III. THE RULE OF ILLINOIS BRICK

A discussion of the ruling set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), must be considered in light of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe*, the plaintiff shoe manufacturer sued the defendant shoe machine manufacturer for antitrust violations. In defense of that action, the defendant argued that the plaintiff suffered no legal harm because it was able to "pass-on" the overcharges to the ultimate consumer. The Court rejected this argument and held that the pass-on defense was unavailable, as a

matter of law, to a seller sued by its direct purchaser for anti-trust damages.

In so holding, the Court allowed the direct purchaser of an overcharged product to sue regardless of whether he passed-on the amount paid for the overcharges. It justified its result by pointing to the damages a direct purchaser was likely to suffer when placed in the position of an intermediary between a controlling seller and a demanding buyer. The Court stated:

If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. This much seems conceded. The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher. It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

392 U.S. at 489, 88 S.Ct. at 229. Thus, the Court chose to avoid punishing a purchaser who sought to maintain his business through price and cost adjustment. Accordingly, the Court held as a matter of law that where such a purchaser is not insulated from the effects of the overcharges, he can sue for damages.

---

**15.** *In First National Bank of Arizona v. Cities Service, supra,* the Supreme Court affirmed the granting of a motion for summary judgment in an oil antitrust suit that had been pending for 11 years. Despite the plaintiff's protestations concerning discovery matters, and the waste of time inherent in a dismissal, the court rejected its arguments, 391 U.S. at 290–92, 88 S.Ct. 1575, and noted that,

[M]uch of the evidence obtained by the other defendants in deposing petitioner and his associates is relied on heavily by petitioner himself to bolster his case against Cities. *Id.* at 291, 88 S.Ct. at 1594.

The facts here present a more compelling situation in favor of granting the motion for summary judgment.

The Court opted for a practical result. It recognized that the defense would complicate litigation and lead to unduly burdensome factual issues.

We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly unsuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.

392 U.S. at 492–93, 88 S.Ct. at 2231. In so holding, the Court decided against a posture that would result in a situation where no buyer could recover for the illegal overcharges. 392 U.S. at 494, 88 S.Ct. at 2232. Thus, the court determined, as a matter of antitrust policy, that a viable class of direct purchasers should be allowed to sue for damages.

In *Illinois Brick Co. v. Illinois, supra,* the Court was faced with a situation where the indirect purchasers of a product sought to sue the manufacturers for overcharges. Thus, the plaintiffs represented that class of purchasers to whom the defendants in *Hanover Shoe* attributed the passed-on costs of the overcharges. The Court held that those indirect purchasers could not sue to recover the overcharges passed on to them. 431 U.S. at 728–29, 97 S.Ct. at 2065–2066.

The Court relied upon its analysis in *Hanover Shoe* to reach that result. The court considered the practical problems of proof which would follow an attempt to delineate the costs actually incurred and passed-on through the distribution chain. 431 U.S. at 732–33, 97 S.Ct. at 2067–2068. Accordingly, the Court refused to abandon its former policy decision to limit the class of plaintiffs to direct purchasers of price-fixed goods. 431 U.S. at 736, 97 S.Ct. at 2069.

[4] That Lefrak was an indirect purchaser requires but a cursory review.[16] The distribution chain in existence for the fuel oil market demonstrates that Lefrak purchased its fuel oil requirements directly from an intermediate level of distributors. Those distributors, in turn, purchased their supplies from other distributors or the suppliers. *See, e. g.,* Deft. Reply App. Exh. C; Deft. App. Vol. III. Thus, before Lefrak purchased the fuel oil, the oil had already entered the market at the wholesale level, and was *at least* one step removed from Lefrak. By the time the product reached Lefrak, the distributors had made their purchases, calculated their costs and profits, and prepared to enter the retail market for resale to their customers. Thus, the distribution process here closely resembles the distribution process noted by the Court in both *Hanover Shoe* and *Illinois Brick.* As a result, Lefrak is rendered an indirect purchaser under those decisions, and is precluded from maintaining an antitrust action.

16. Indeed, prior to this motion for summary judgment, it appeared that Lefrak necessarily abandoned this contention when this court allowed it to amend its complaint to bring it solely within the cost-plus contract exception.

## IV. EXCEPTIONS TO ILLINOIS BRICK

■ While the decisions in *Hanover Shoe* and *Illinois Brick* represented a strict rule of law barring suit by a large class of potential plaintiffs, the decisions recognized two potential exceptions to that rule. Those exceptions permit an indirect purchaser to sue for damages when one of the links in the chain of distribution is "owned or controlled by" another link and when there exists a "pre-existing cost-plus contract" between a direct and indirect purchaser. The motion before the court raises the applicability of those exceptions to the situation here.[17]

### A. The "Owned or Controlled by" Exception

In *Illinois Brick*, the court noted that where "market forces have been superseded" because the "direct purchaser is owned or controlled by its customer," an indirect purchaser may sue to recover damages. 431 U.S. at 736 n. 16, 97 S.Ct. at 2070. Thus, if Lefrak could demonstrate that the distributors' intermediary position in the distribution chain was emasculated by the ownership or control by Aramco, it could avoid the effect of the indirect purchaser rule.[18]

■ The facts before the court clearly indicate that Lefrak is not entitled to invoke this exception. The distributors acted independent of their suppliers, and made contract and pricing decisions according to their individual concerns. This lack of ownership or control is amply supported by the exhibits presented to the court.

For example, the distributors were in a competitive industry, marked at times by "cutthroat" competition. Pltfs. Exh. Vol. II Carini Affidavit ¶ 13; Deft. Reply App. Exh. B at 102; Deft. Reply App. Exh. C at 72. Their pricing decisions were not controlled by defendants but were the result of individual considerations. Deft. Reply App. Exh. A, B, C. Moreover, the barge prices did not invariably represent the prices to be charged by the distributors. The actual prices used depended on factors independent of the suppliers' price lists. Deft. Reply App. A, B, C; Deft. App. Vol. III. Lefrak itself was a motivating force in the use of that pricing system. Deft. App. Vol. II 16–21, 25; Deft. Reply App. Exh. A at 62. More importantly, Aramco did not compel the use of such a reference price and did not control the actual prices charged by the distributor. Deft. Reply App. Exh. B, C.

The court finds that there is a patent lack of evidence to demonstrate a material issue of fact concerning Aramco's ownership of or control over the distributors. Accordingly, Lefrak is not entitled to rely upon this exception as a matter of law.

### B. The Pre-Existing Cost-Plus Contract Exception

The Supreme Court in both *Hanover Shoe* and *Illinois Brick* recognized a narrow exception to its rule where the direct purchaser "passed-on" all of his overcharges directly and invariably to the indirect purchaser pursuant to a "pre-existing cost-plus contract." *Hanover Shoe* recognized the cost-plus contract exception since, under that limited situation, it would be "easy to prove that [the direct purchaser] has not been damaged." 392 U.S. at 494, 88 S.Ct. at 2232.

In *Illinois Brick*, the Supreme Court clarified *Hanover Shoe's* enunciation of the cost-plus exception. First, it is clear that the Supreme Court envisioned that the exception would be narrowly construed. The Court permitted a suit to be maintained by an indirect purchaser only where he established the presence of a pre-existing cost-plus contract which circumvented complex

---

17. Other potential means for an indirect purchaser to bring suit are presented in Note, 63 Cornell L.Rev. 309 (1978). Since none of those situations apply to this case, the court will focus its attention on the two exceptions referred to above. The court notes, however, that the federal government and some state governments are conducting investigations into alleged overcharges, and are proceeding in *parens patriae*.

18. There is no allegation that Lefrak owned or controlled the distributors.

market interactions. It was conceded in both *Hanover Shoe* and *Illinois Brick* that the doubtfulness of the economic connection between the initial overcharge and the price paid by indirect purchasers, coupled with the complex problems of proof of such passing on of the overcharge, necessitated the development of limitations on the extent to which such speculation could be tolerated. 431 U.S. at 732, 97 S.Ct. 2061; 392 U.S. at 492–93, 88 S.Ct. at 2231. *See generally* "Comment, In the Face of Uncertainty— The Passing-On Concept in Civil Antitrust Litigation," 27 Ark.L.Rev. 83, 110 (1973).

A pre-existing cost-plus contract, however, provides a formula for the automatic determination of those prices and excess costs which are passed-on. It thereby eliminates the cumbersome problems of proof needed to determine the damages attributable to a reduction in the direct purchaser's sales. The cost-plus contract insulates the direct purchaser from any decrease in its sales as a result of a pass-on of the overcharge because its customer is committed to buying a fixed quantity regardless of price. 431 U.S. at 736, 97 S.Ct. at 2069. *See generally* Schaefer, "Passing-On Theory in Antitrust Treble Damage Action: An Economic and Legal Analysis," 16 Wm. & Mary L.Rev. 883 (1975). Fixed quantity thus involves a relationship whereby a party is locked into buying a fixed amount regardless of price fluctuations and with no recourse in the open market for buying a greater or lesser quantity at competitive prices. In this way, the effect of the overcharge is "determined in advance, without reference to the interaction of supply and demand." 431 U.S. at 736, 97 S.Ct. at 2070.

The effects of such a contract are clear. The direct purchaser who resells under such a contract is necessarily insulated from any harm which might occur due to increases in price and cost. Any overcharges incurred by him are simply passed-on in their entirety. Similarly, the indirect purchaser's demand for the product is completely inelastic because the indirect purchaser must buy the same quantity at one price, even though the price may vary with the direct purchaser's cost.[19] Schaefer, *supra*, at 892. As a result of the interaction thus imposed by the contract, the amount of the overcharges passing through one stage of the distribution chain to the next is apparent. On the other hand, where a fixed quantity does not exist, and an indirect purchaser is free to vary the amount of its purchases in response to price changes, the evidentiary problems incident to allocating the amount of the overcharges arise.

The cost-plus contract exception is thus a fragile principle grounded in law and economics. In essence, the exception involves three essential elements; first, that there exists an automatic pass on to the full extent of the overcharge to indirect purchasers; second, that the direct purchaser is insulated from any decrease in sales or profit; and third, that a contract exists which commits the indirect purchaser to buying a fixed quantity regardless of price. *See generally Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979); *Abbotts Dairies Division of Fairmont Foods, Inc. v. Butz*, 584 F.2d 12 (3d Cir. 1978); *Beckers v. International Snowmobile Industry Assoc., AMF, Inc.*, 581

19. There is, in essence, perfect inelasticity of demand; the same quantity will be demanded regardless of price.

Price & Cost

In a market where the demand is inelastic, the full burden of an excess charge is passed on to the buyer; after the shift of the supply curve from S to S$^l$, reflecting the increased costs incurred by the seller, the quantity demanded ($Q_0$) remains the same. Thus, regardless of the price increases from $P_0$ to $P_l$, the same quantity is demanded with the result that the entire overcharge is shifted to the buyer. *See generally* P. Samuelson, *Economics* (10th ed. 1976).

F.2d 1308 (8th Cir. 1978); *United States v. Consolidated Edison Co. of New York, Inc.*, 580 F.2d 1122 (2d Cir. 1978); *In re Fertilizer Antitrust Litigation*, 19792 Trade Cas. ¶ 62,894 (E.D.Wash.1979); *City of Mishawaka, Indiana v. American Electric Power Co., Inc.*, 465 F.Supp. 1320 (N.D.Ind.1979); *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 470 F.Supp. 1050 (S.D.Fla.1979); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 50 F.R.D. 13 (E.D.Pa.1971), *aff'd per curiam, Mangano v. American Radiator & Standard Sanitary Corp.*, 438 F.2d 1187 (3d Cir. 1971); *City and County of Denver v. American Oil Co.*, 53 F.R.D. 620 (D.C.Colo.1971). Thus, the cost-plus exception has been found to mean that the purchaser-seller's profit is guaranteed and controlled by a contract rather than by relatively unascertainable economic conditions. Under such circumstances, the overcharge must be passed-on automatically to the buyer with whom the purchaser-seller has his cost-plus contract and the quantity of sales and profits must remain constant despite the overcharge.[20] *Abbotts Dairies Division of Fairmont Foods, Inc. v. Butz, supra* at 16.

■ On the basis of the record before it, the court finds that Lefrak's ability to negotiate with its distributors, Lefrak's ability to change distributors on the basis of its business concerns, Lefrak's flexibility in purchasing quantities of fuel oil as needed, and the consequent loss of profits which befell the distributors, *in toto*, negate the existence of a contract which locked the consumer into buying a fixed quantity regardless of price, and which insulated the middlemen from financial injury. The court will discuss the factors *seriatim*.

*The Automatic "Pass On"*

The existence of a pre-existing cost-plus contract allows a precise determination of the excess costs passed on and avoids a determination of damages attributable to a reduction in the direct purchaser's sales. *Cf. Yoder Bros. v. California Florida Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976). For this to occur, the middlemen, or the oil distributors in this case, must adhere to a rigid pricing formula such that the entire overcharge is undeviatingly passed on to Lefrak without reference to the forces of the marketplace. *Illinois Brick, supra*, 431 U.S. at 736, 97 S.Ct. at 2069; *Mid-West Paper Products Co. v. Continental Group, supra* at 577.

The voluminous record before the court belies any notion of an automatic pass-on of the alleged overcharges. Lefrak explains that the contractual price terms were set in relation to the Exxon barge price or the Shell barge price. The price of fuel oil,

---

**20.** Some commentators, however, have admonished the courts to permit the use of passing on in situations that are the functional equivalent of the cost-plus contract. *See, e. g.,* Note, "Recovery By Indirect Purchasers and The Functions of Antitrust Treble Damages," 55 Tex.L.Rev. 1445 (1978); Note, "Scaling The Illinois Brick Wall," 63 Cornell L.Rev. 309 (1978). Yet, even under a cost-plus equivalency test the policies of, *Illinois Brick* must be promoted. Specifically, the overcharge must be determined in advance without reference to the interactions of supply and demand and the possibility of overlapping liabilities must be eliminated. *In re Beef Industry Antitrust Litigation*, 600 F.2d 1145 (5th Cir. 1979). Thus, where the prices between middlemen and consumers were derived directly and invariably from rates reported in a "yellow sheet" national news service which were compiled by a conspiracy of sellers wielding monopsony power, the Fifth Circuit found that the equivalent of a cost-plus contract existed. *In re Beef Industry Antitrust Litigation, supra* at 1154. However, the Fifth Circuit vividly defined the scope of that exception. First, it stated that plaintiffs were in no position to negotiate prices because they could not withhold a perishable product. In essence, the supply was inelastic. Second, the impact of the alleged overcharge was determined in advance without regard to the interactions of supply and demand. *Id.* at 1165. Third, the use of a predetermined formula to set price was rigidly adhered to and avoided any possibility of duplicative recoveries. *Id.* at 1165–66. *Compare* the use of the barge price by the distributors and Lefrak, *infra*.

therefore, would rise or fall according to increases or decreases in the posted barge price. This purportedly automatic pricing mechanism enabled the distributors to pass on overcharges from the suppliers in their entirety and insulated the distributors from any decrease in sales.

According to the distributors, however, their resale prices were not based on a rigid formula and did not even meet their actual costs. Defts. Reply App. Exh. A, B, C. Mr. Ross of Premium testified that his company was not purchasing the oil at the barge price. Actual costs for No. 6 fuel oil were determined by negotiation with the actual suppliers and depended on a number of market variables. *See, e. g.,* Ross Afft., ¶ 6. Yet, a pre-existing cost-plus contract presupposes a resale price based upon a fixed percentage of the direct purchasers' actual costs or average total cost of the product so that any increased charges are passed on to the indirect purchaser with precision and without loss of sales to the direct purchaser.

Here, however, the distributors were not mere conduits, automatically passing on actual price increases. The contracts between Lefrak and the distributors represented the fruition of business acumen and competitive forces. Lefrak was no lilliputian in the marketplace. In fact, the record indicates that the distributors were most desirous of gaining the Lefrak contract. For example, several of the Lefrak contracts with Whale Oil, Whaleco and Premium provided for maximum increases to Lefrak, regardless of increased costs to the distributors. Defts. App. Vol. I, Exh. 12, 14, 17. Thus, when there was an increase in actual costs to Premium during the duration of the contract period with Lefrak, Premium could not pass on that increase. Defts. Reply App. B. In reality, the distributors were forced to absorb the price differential which indicates that the distributors' profits were diminished by their increased costs. The distributors were, therefore, the proper parties injured which concomitantly creates a serious risk of multiple liability if offensive use of pass on is permitted under these facts. *See Hanover Shoe, supra* 392 U.S. at 489, 88 S.Ct. at 2228.

The contractual pricing formula used in the Lefrak-distributor contracts, could not even be deemed a cost-plus equivalent since there was no strict adherence to a rigid formula which would avoid duplicative recoveries and complex damage apportionment. Mr. Klein of Lefrak testified that Lefrak, as a prudent buyer, sought to use the posted barge prices as a barometer from which one could negotiate price. "A prudent buyer would try to stabilize his price and have some base upon which to negotiate a price, otherwise you would be at the whim of the marketplace." Defts. App. II at 25. Thus, it is evident, that the parties used the barge prices as mere indicators to estimate cost and negotiate price. Defts. Reply App. Exh. A, B; Pltf. App. Vol. I, Exh. B.

How could there exist a rigid adherence to a pricing formula which would insulate distributors from any decrease in sales, when Lefrak's efforts to renogtiate distributor price increases downward proved successful? The Lefrak organization never accepted distributor price increases as gospel without first seeing the distributors and "trying to negotiate the price downward." Defts. App. Vol. I, Exh. 1. According to voluminous documentation, Lefrak often was successful in renegotiating to its advantage the distributors' initial pricing determinations. Pltf. App. Vol. I, Exh. B; Defts. App. Vol. II, at 141, 203. By way of example, Lefrak was able to negotiate downward an announced price increase by Whaleco in 1974. Defts. App. Vol. I, Exh. 24, 25. Lefrak had similar success with Castle. Defts. App. Vol. I, Exh. 26. Such negotiations necessarily were translated into savings for plaintiff and losses for the distributors. Unlike the situation present in a pre-existing cost-plus contract where excess costs are determined precisely and a complex division of damages is avoided, the apportionment of damages between Lefrak and the distributors rests upon an analysis of the negotiation process and the vagaries of the market.

The record demonstrates beyond peradventure that Lefrak was able to avoid a full pass on of the increased fuel oil costs, Pltf. App. Vol. I, Exh. B. Specifically, Lefrak was able to change distributors in an effort to get the best possible price. Pltf. App. Vol. I, Exh. A–1, A–2; Defts. App. Vol. II, at 102; Defts. App. Vol. II, at 115–116. Such maneuvers do not represent pre-determined control of market forces, but reflect the dynamics of the marketplace with consequent increases and decreases in sales, costs and profits.

Such possibilities of free business dealings militate against a finding that actual costs were automatically passed on to the indirect purchaser without reference to the interaction of supply and demand. In reality, the existence of price negotiations and the strong bargaining position of Lefrak indicate not only that the distributors absorbed part of the alleged overcharge, but also that any attempt to allocate damages *a fortiori* would inject massive evidence and complicated theories into the proceedings.

### Injury to the Direct Purchaser

The existence of maximum price contracts, renegotiations in price and changes in the choice of supply resulted in the absorption of both costs and reference price increases by the distributors. This situation is in contradistinction to the mandate of *Illinois Brick* which envisions the purchaser as fully insulated from any decrease in sales. *Illinois Brick, supra*, 431 U.S. at 736, 97 S.Ct. at 2069. Here, the record clearly demonstrates that the middlemen were harmed. Defts. Reply App. Exh. C; Defts. App. Vol. II, at 55–60. Since there was no automatic, undeviating pass-on, unanticipated price increases created a risk of loss for the distributors. Defts. App. Vol. II, at 55–60. That loss was realized when the distributors were precluded from basing the Lefrak contracts on actual costs for No. 6 fuel oil. Defts. Reply App., Exh. C; Defts. App. Vol. I, Exh. 24, 25. Similarly, when Lefrak changed distributors to find a fair price, the middlemen necessarily lost sales volume. Defts. App. Vol. I, Exh. 2, 5.

Thus, as the court noted in *Hanover Shoe, supra*, 392 U.S. at 489, 88 S.Ct. at 2229, the overcharges punished a middleman who attempted to achieve business efficiency. Similarly, here, the suppliers and Lefrak caused the distributors to operate efficiently by reducing costs, cutting prices and otherwise seeking to gain a competitive advantage over the other distributors. In effect, the most efficient distributor was the one able to cut costs and price increases to an extent favorable to Lefrak. By so acting, it is evident that the distributors were harmed, and represent a potential class of plaintiffs. Thus, it is clear, that a complete pass-on without injury to the distributors could not occur.

### Fixed Quantity Contract

Lefrak strained to come forth with facts demonstrating fixed quantity contracts. Nowhere, however, is it able to present contracts which lock Lefrak into buying a fixed quantity regardless of price fluctuations in the market. Indeed, the contracts expressly permitted Lefrak to buy from other distributors so as to take advantage of more favorable prices. Pltf. App. Vol. I, Exh. A–1, A–2; Defts. App. Vol. I, Exh. 2; Defts. Reply App., Exh. C.

The feasibility exercised by Lefrak in renegotiating prices and changing suppliers destroyed any opportunity of the distributors to insulate themselves from decreases in sales. Pltf. App. Vol. I, Exh. B. Thus, Lefrak's ability to deal with several suppliers enabled it to shift its volume requirements as pricing policy dictated. Defts. App. Vol. II, at 101–02; Defts. Reply App., Exh. C.

Lefrak's contracts contained only approximate quantities to be purchased. Klein, Dec. 4 Afft. ¶ 3. A fixed quantity commitment is, however, essential to establishing the cost-plus exception. *See, e. g. Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979); *City of Mishawaka, Indiana v. American Electric Power Co., Inc.*, 465 F.Supp. 1320 (N.D.Ind.1979).

Further, Lefrak's needs were not predetermined but fluctuated with the

quality of oil used and the severity of weather conditions. Pltf. Exh., Dec. 7, 1979, Klein Aff., Exh. A. Finally, Lefrak's purchases of heating oil voluntarily declined from 1973 to 1974 because of a conservation program instituted by plaintiffs to counteract bleak market conditions. Defts. Exh., Dec. 10, 1979, at 7. Thus, Lefrak was not committed to buying a fixed quantity regardless of price.[21]

In conclusion, the court has taken into account all the exhibits submitted and concludes that no pre-existing cost-plus contract existed between Lefrak and the distributors. First, there was no automatic pass-on of the overcharge by suppliers to the indirect purchasers, Lefrak. Second, the distributors unequivocally suffered damage and absorbed an undetermined amount of excess costs. Third, no fixed quantity contract existed since the indirect purchasers were not locked into buying a fixed amount regardless of price. Price was at all times a relevant factor in the business decisions of the parties even after the contracts were consummated. Accordingly, Lefrak is not entitled, as a matter of law, to rely upon a pre-existing cost-plus contract exception. Its federal antitrust claims are dismissed. *Illinois Brick Co. v. Illinois, supra.*

## V. REMOTENESS

■ While summary judgment is granted sparingly in antitrust cases, *Poller v. Columbia Broadcasting*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), it is equally clear that a plaintiff in a civil antitrust action must establish a clear causal connection between the violation alleged and the injuries allegedly suffered. *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). Now, after five years of discovery, the plaintiffs must bridge the gap between the acts alleged and the injury claimed.

Plaintiffs contend that the defendants have conspired through joint ventures such

---

**21.** Lefrak's attempt to fit a general requirements contract into the pre-existing cost-plus contract exception is misplaced. The use of requirements contracts as a reasonably elastic means to provide for the long-term needs of a consumer is well-settled. *See* Uniform Commercial Code § 2–306 (McKinney's 1964), and commentary thereto; 1 Williston on Contracts § 104A. Those contracts, however, often create uncertainty as to meaning and effect. *See* 6 Simpson & Duesenberg, *Contracts* § 310. Thus, it would be anomalous to hold in the face of *Illinois Brick* that a requirements contract is *per se* a cost-plus contract, when in reality those contracts are designed to avoid the exactness imposed by the Supreme Court for determining the existence of a cost-plus contract. Moreover, the fact that Lefrak's actual requirements for the years 1968–1974 were within a general range of 12 to 14 million gallons does not demonstrate the existence of a cost-plus contract. The relative stability of Lefrak's needs can be attributed to factors other than contractual demands. *See, e. g.* n. 10 *supra*. The mere fact that a consumer's needs are within a general range is insufficient to show that those quantities flowed from a cost-plus contract situation. Indeed, the Supreme Court in *Illinois Brick* recognized that variations in market patterns may arise in the context of its decision, but rejected any attempt to fashion exceptions to fit those market structures. It noted:

> An exception to the contractors here on the ground that they purport to charge a fixed percentage above their costs would substantially erode the *Hanover Shoe* rule without justification. Firms in many sectors of the economy rely to an extent on cost-based rules of thumb in setting prices . . . These rules are not adhered to rigidly, however; the extent of the markup (or the allocation of costs) is varied to reflect demand conditions . . . The intricacies of tracing the effect of an overcharge on the purchaser's prices, costs, sales and profits thus are not spared the litigants. 431 U.S. at 744, 97 S.Ct. at 2074.

Thus, the facts before the court, as set forth in the body of this decision, belie any assertion that the requirements contracts used by Lefrak as a reasonable means to guarantee supply were pre-existing cost-plus contracts under *Illinois Brick*. *See also City of Mishawaka, Indiana v. American Electric Power Co., Inc.*, 465 F.Supp. 1320 (N.D.Ind.1979).

Lefrak's further argument that it is a direct purchaser as to title is without merit because all indirect consumers eventually gain title to the product. Lefrak's interpretation of the law is unwarranted. *See also Illinois Brick Co. v. Illinois, supra* (indirect purchases not entitled to sue although having "title" to brick as a necessary adjunct to title to building).

as the Iranian Consortium to control the supply of crude oil and thereby to charge monopoly prices for petroleum products. These monopoly prices were paid by plaintiffs when they purchased No. 6 heating oil at defendants' posted prices. Plaintiffs, in their Memorandum of Law dated November 15, 1979 and at oral argument on November 16, 1979 claimed that this illegal conspiracy and its direct effect on New York heating oil prices can and will be proved through defendants' conduct, ventures and pricing policy.

■ Mere allegations that the plaintiffs are not indirectly injured but directly harmed, do not clarify the issue of whether Lefrak is the proper party to bring suit. While antitrust violations create entirely foreseeable ripples of injury which disrupt the general economy, it is acknowledged that not all of those parties injured have the requisite standing to sue for treble damages. *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). The standing concept thus helps to control the floodgates to excessive litigation which threaten general business behavior. *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's Inc.*, 473 F.Supp. 951 (S.D.N.Y. 1979). Further, the concept of remoteness, by restricting the type of litigant who can sue in an antitrust case, reinforces, and in turn, finds support in, the principle of *Illinois Brick*. Consequently, a plaintiff must allege a causative link to his injury which is " 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act." *Billy Baxter, Inc. v. Coca-Cola Co., supra* at 187.

The necessity to limit the class of potential antitrust plaintiffs results from the fact that the damage to remotely situated persons is much more speculative and difficult to prove than the injury which befalls a competitor. *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Rules of standing thus serve to exclude remote parties with possibly speculative injuries. *See generally Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *GAF Corp. v. Circle Floor Co., Inc.*, 463 F.2d 752 (2d Cir. 1972), *cert. denied*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

Here, the complaint alleges a global conspiracy among oil suppliers which artificially raised the price of New York heating oil, thereby injuring plaintiff, a New York landlord.[22] The ripple effects incident to this alleged conspiracy could conceivably have an adverse effect on the business of Lefrak. However, Lefrak could not be considered the object of the alleged antitrust violation. Rather, Lefrak's injuries were the result of its relationships with other parties. Those who have suffered economic damage by virtue of their relationships with targets or intermediate non-targets, and who are not targets or are not directly injured, are precluded from suing for treble damages in a private antitrust action. *Calderone Enterprises Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *S.C.M. Corp. v. Radio Corp. of America*, 407 F.2d 166 (2d Cir.), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461, *rehearing denied*, 396 U.S. 869, 90 S.Ct. 38, 24 L.Ed.2d 125 (1969); *Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

22. The court is not unmindful of the fact that in *Lefrak v. ARAMCO, et al.*, 405 F.Supp. 597 (E.D.N.Y. 1975), it found that plaintiffs established a direct causative link between their injuries and the alleged conspiracy. The allegations made in 1975, however, are in stark contrast to the case now before the court. The domestic conspiracy has blossomed into an international conspiracy, Thus, the court must now consider important geographical factors in assessing the target area concept. *Long Island Lighting Co. v. Standard Oil of California*, 521 F.2d 1269 (2d Cir. 1975).

In conclusion, plaintiff, a New York landlord who purchased No. 6 heating oil, but not crude oil,[23] was not the target of the alleged conspiracy. Second, Lefrak did not establish a direct causative link to his injury. Accordingly, the global conspiracy allegations are dismissed.

## VI. PENDENT JURISDICTION

Aramco's final contention concerns the four remaining causes of action which are based on pendent jurisdiction. Those causes of action are based on New York State law and allege violations of the Donnelly Act, General Business Law § 340, and intentional torts. Having dismissed the federal causes of action, this court must consider whether it should retain jurisdiction over those pendent state claims.

There is no dispute that the state law claims were based on pendent jurisdiction, having arisen out of a common nucleus of operative fact with the federal claims and being of such a nature that they would be tried together. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Pendent jurisdiction is a matter of judicial discretion. *United Mine Workers v. Gibbs, supra; Federman v. Empire Fire and Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979); *Naylor v. Case and McGrath, Inc.*, 585 F.2d 557, 561 (2d Cir. 1978).

> Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them . . . *Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a sur-*

er-footed reading of applicable law. *Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.* Similarly, *if* it appears that *the state issues substantially predominate,* whether *in* terms of proof, *of the scope of issues raised,* or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. 383 U.S. at 726–27, 86 S.Ct. at 1139 (emphasis added). Indeed, where, as here, the federal jurisdictional peg is lost because the federal claims are dismissed, the *recommended* procedure in this circuit is to dismiss the state law claims. *Federman v. Empire Fire and Marine Ins. Co., supra* at 809.

The court has balanced considerations of comity, fairness, judicial economy and especially the avoidance of unnecessary decisions of state law, and finds that it must dismiss the pendent state claims. *Federman v. Empire Fire and Marine Ins. Co., supra* at 809. The issues raised by the parties concerning state law are significant and should be left to the state courts for resolution. This is apparent by the fact that a lower state court decision, *Russo & Dubin v. Allied Maintenance Corp.*, 95 Misc.2d 344, 407 N.Y.S.2d 617 (Sup.Ct.1978), has taken a position contrary to that expressed by Lefrak, and injurious to its Donnelly Act claims. Moreover, the parties will not be inconvenienced since all discovery completed here may be used in the state court action as well. Since it is proper for the Donnelly Act claims to be brought in the state courts, it follows naturally that the related intentional tort claims should be brought in the state courts as well.[24]

---

23. Crude oil and its refined by-products are "different" substances. *Carey v. National Oil Corp.*, 592 F.2d 673, 676 (2d Cir. 1979). *See also Bill Minielli Cement Contracting, Inc. v. Richter Concrete Corp.*, 62 F.R.D. 381, 389 (S.D.Ohio 1973).

24. Lefrak contends that its demand for injunctive relief under federal law is a basis for retaining jurisdiction over the pendent state law claims and for denying Aramco's motion for

summary judgment under *Illinois Brick*. Even assuming that Lefrak's argument that *Illinois Brick* bars only damage actions and not claims for injunctive relief is correct, *see In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979); *Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979), the court nonetheless finds that it must dismiss Lefrak's claims. First, any basis for granting injunctive relief at this time for violations that allegedly ceased in 1974 is remote.

Accordingly, the remaining state law claims are dismissed.[25]

## VII. CONCLUSION

In a period when the prices for heating oil and gasoline are rising precipitously, this court is cognizant of the feelings of anger and frustration expressed by the nation's consumers. Throughout these times, the oil companies have been the object of the public's vilification. Indeed, each new price increase heightens the public outcry and brings forth new demands for governmental inquiry. In that setting, then, it may seem ill-advised and unsympathetic to render any decision against the consumers.

The court itself is not immune from the burdens placed upon it as a result of rising prices and an unstable market, and can relate to the pressures experienced by its fellow consumers. Yet, it is a hallmark of our Constitutional processes that all litigants are entitled to a full and fair determination based not on caprice or popular feeling, but on the law and merits of each case.

While the court recognizes that this is one of the nation's most significant private antitrust cases pending, it is constrained to follow the principles set forth in *Illinois Brick*. A policy determination which eliminates the barriers to suit that face an indirect purchaser now must come through legislative action and not judicial fiat. Indeed, the Senate Judiciary Committee is scrutinizing the rule of *Illinois Brick*,[26] and movement is underway to overrule both *Illinois Brick* and *Hanover Shoe*.

The Senate bill (S.300) now pending before the Committee on the Judiciary, would amend the federal antitrust laws to permit "consumers, businesses, and governments injured by antitrust violations to recover damages whether or not they have dealt directly with the antitrust violator."[27] The bill thus unravels the knot tied by the Supreme Court which limited the underlying substantive rights of most consumers.[28]

The Committee rejected the underlying premise of *Illinois Brick* and *Hanover Shoe*. Specifically, it maintained that the apportionment of damages among a multiplicity of antitrust plaintiffs is not too complex a task for the federal courts.[29] The Committee stressed that existing principles of fairness and just compensation will be furthered, not frustrated, by this legislation since victims of antitrust violations would

*See, e. g., Long Island Lighting Co. v. Standard Oil Co. of Calif.*, 521 F.2d 1269 (2d Cir. 1970), *cert. denied*, 401 U.S. 923 (1971). Second, there is a patent lack of an immediate, threatened injury to plaintiffs which would support a claim for injunctive relief. 15 U.S.C. § 26. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. Borden Co.*, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954). Thus, this case presents a different factual situation than that in either *In re Beef Industry, supra* or *Mid-West Paper Products, supra*. Thus, there is no basis for retaining jurisdiction over the state claims or for denying Aramco's motion. *See also Illinois Brick Co. v. Illinois, supra* (claims for both damages and injunctive relief dismissed).

Lefrak further asserts that this court has jurisdiction over some of the defendants pursuant to 28 U.S.C. § 1332. It is established that coconspirators are not indispensable such that their absence would result in dismissal for nonjoinder. Fed.R.C.P. 19; *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970). The following circumstances, however, indicate that dismissal is appropriate: all federal questions have been dismissed; unsettled questions of state law are present; the state judicial system is reviewing questions similar to those posed by Lefrak's Donnelly Act claim and is suited for state court determination. Finally, plaintiff's attempt to exclude some defendants, at this late date, after years of discovery among all parties and after the issues have been framed by and as among all parties so that the court can retain federal jurisdiction over the intentional tort and Donnelly Act claims, must fail. Accordingly, dismissal would, in any event, be appropriate.

25. The dismissal will not bar a subsequent suit by Lefrak in the state courts. It appears that §§ 203(d), 205(a), (b) of the Civil Practice Law and Rules of New York (McKinney's 1972) apply to Lefrak's assertion of its state law claims here, and serve to toll the applicable statute of limitations. *See Federman v. Empire Fire and Marine Ins. Co., supra* at 809, n. 18.

26. *See* S.Rep. No. 96–239, 96th Cong., 1st Sess. (1979).

27. *Id.* at 1.

28. *Id.* at 2.

29. *Id.* at 3.

be compensated, conspiracies to restrain trade would be deterred and effective antitrust enforcement would be restored.

Thus, legislative activity is afoot to ensure that the central purpose of the antitrust laws is effectuated. As indicated in the Committee Reports, however, the federal courts today are constrained by the language of *Illinois Brick*. In a system based upon checks and balances between the different branches of governmental authority, this court must leave a determination concerning the efficacy of changing the policies behind the antitrust laws to the legislature.

The court finds on the facts and law before it that Lefrak is not entitled to recover as a matter of law. Accordingly, the Clerk of' the court shall enter summary judgment on behalf of the defendants. This decision shall constitute the final order of this court.

SO ORDERED.

## APPENDIX A

The contracts appended to this decision are representative of those entered between Lefrak and its distributors.* While these contracts were previously subject to this court's protective order, the decision rendered by the court dissipates the need for continued confidentiality.

## FUEL SUPPLY CONTRACT

October 10, 1973

This agreement, between CASTLE COAL & OIL COMPANY, INC., hereinafter called the Seller, and Lefrak Organization, Inc. , hereinafter called the Purchaser, is as follows:

The Seller agrees to provide and deliver, and the Purchaser agrees to purchase and receive, during the term of this agreement, approximately 8,000,000 gallons of product #6 fuel oil at the following locations:

SEE SCHEDULE ATTACHED.

*Our price is $.60 per barrel over Exxon's Consumer New York harbor barge price of $6.25 per barrel, making today's net delivered price $6.85 per barrel, or $.1631 per gallon. The differential shall remain fixed but the Exxon Consumer price shall either increase or decrease in accordance with its published price in the New York Journal of Commerce on day of delivery.

SEE RIDER ATTACHED

Subject to the following terms and conditions:

Price: $.1631*

The price herein quoted is the Seller's prevailing price as of the date of the Contract. ~~Said price is subject to change at any time in the event a general increase in product and/or labor should occur.~~

Effective Dates: 10/10/73 to 10/9/74 .

~~It is expressly understood and agreed to by the Purchaser that all invoices are due and payable within thirty (30) days or by the tenth (10th) of the month following date of delivery. A late penalty charge of 1½% per month (18% per year) shall be added to all past due amounts. It is expressly understood and agreed to that the failure of the Purchaser to comply with those terms shall constitute a full and material breach of this Contract on the part of the Purchaser and the Seller shall not be obliged to continue to perform hereunder.~~

All services, which are the subject of this agreement, shall be rendered by the Seller during the Seller's normal business hours. Any deviation from this provision shall be at the Seller's option or by special arrangement between Seller and Purchaser.

* Editor's note: all but one contract has been deleted for publication.

The Seller shall have no responsibility or liability for failure to fulfill any obligations under this agreement when prevented from so doing by strikes, lockouts, accidents, wars, embargoes, acts of God or any conditions beyond Seller's reasonable control.

It is further expressly understood and agreed that the Seller shall not be liable for damages caused by the negligence of its employees unless written notice thereof is received by the Seller within a reasonable period.

This agreement constitutes the entire Contract between the parties. This agreement must be returned to the Seller within fifteen (15) days of its submittal and is not valid unless and until signed and approved by the Seller or an officer of the Seller.

CASTLE COAL & OIL CO., INC. ACCEPTED: LEFRAK ORGANIZATION, INC.
 Purchaser

By: _____ By: _____

Date _____ Date _____

---

*RIDER TO AGREEMENT DATED OCTOBER 10, 1973 BETWEEN CASTLE COAL & OIL CO., INC. & LEFRAK ORGANIZATION, INC.*

1. Buildings to be supplied will be located in Brooklyn, Queens, Manhattan, Bronx, Staten Island and Mount Vernon, New York, but which may be deleted, substituted and/or added to at owner's option.

2. Terms of payment will be by invoices submitted and payment shall be made thirty (30) days net after the receipt of such invoices by the purchaser's Accounting Department. The buyer hereby states that because of its computerized system, some delays, at times, might occur. The buyer will make every effort to pay in accordance with the terms hereinabove mentioned, but the parties acknowledge that in no event will payments be made later than forty-five (45) days from the date of receipt of invoice.

 It is understood that the failure of the purchaser to reasonably comply with these terms, as outlined, shall constitute a breach of the contract and the seller shall not be obliged to continue to perform hereunder.

3. Present oil being delivered is 0.3% maximum sulphur content as promulgated by the New York City Administrative Code. If the Exxon consumer New York harbor barge price of # 6 fuel oil changes, because the permissible sulphur content is changed (in accordance with government regulations), the price of the delivered # 6 fuel oil shall be reduced by the change in the Exxon consumer New York harbor barge price for such increased sulphur content oil.

4. The parties hereto acknowledge the energy crisis and oil shortage. It is the owner's intention that its requirements for the period of this contract be met both as to supply and cost and, therefore, reserves on to itself the right to purchase oil from sources other than Castle, if such action should arise where buyer, in its own discretion, deems such action reasonable. Any such purchase of oil will not be deemed a breach or termination of this contract but rather in furtherance thereof.

5. Anything herein to the contrary notwithstanding, it is the intention of the parties that in the absence of any government action or intervention affecting the supply and/or price of oil, the buyer's position vis-a-vis any other customers of the seller shall in no way be prejudiced, excepting hospitals, nursing homes, schools, orphanages and any other institutions providing health and welfare care.

6. All deliveries will be made by certified metered trucks.

7. The purchaser will instruct its employees to place orders for oil at least forty-eight (48) hours prior to delivery. Cas-

tle, however, in the event of emergency, will accept twenty-four (24) hour notice and will deliver promptly.

8. Price quoted herein is based on or within present Federal Phase 4 Guidelines.